**STATE of Maine**

**v.**

**Simon P. COTY.**

**STATE of Maine**

**v.**

**Milton R. SWETT.**

Supreme Judicial Court of Maine.

April 18, 1967.

Howard M. Foley, County Atty., and Albert Chick Blanchard, Asst. County Atty., Bangor, for appellants.

Albert H. Winchell, Jr., Bangor, for defendant Coty.

Lewis V. Vafiades, Bangor, for defendant Swett.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, and DUFRESNE, JJ.

WEBBER, Justice.

These two respondents, separately indicted, were tried together and convicted by a Penobscot County jury of robbery and murder. The crimes were committed in the evening hours of October 17, 1964. Discovery was made on the following morning. On October 20, 1964 one Stanley Corey, an accomplice and subsequently a witness for the State, was arrested and charged with the murder. Shortly after, the respondents were arrested and similarly charged. After a four day hearing commencing on November 5th the District Court found probable cause and held the respondents for grand jury consideration. They were subsequently indicted. Trial commenced on February 13, 1965 and was completed on February 25, 1965.

## CHANGE OF VENUE

The respondents seasonably filed motions for change of venue alleging in effect that pretrial publicity by newspaper, magazine, television and radio had created an atmosphere so prejudicial to respondents that it would be impossible for them to obtain a fair trial by an impartial jury in Penobscot County. These motions were heard by the Presiding Justice commencing on January 25, 1965 and prior to arraignment and the introduction of evidence bearing thereon occupied the greater part of two days. The motions were denied and respondents' claim of error presents for our consideration the most important issue in the case.

On Sunday, October 18, 1964 Edward I. Morris and his son Harold L. Morris were found dead in their home in Bangor. They had been beaten and robbed. Their home had been ransacked. Harold L. Morris, for whose murder the respondents were tried, had died as the result of a gunshot wound which severed his femoral artery and vein. As promptly as circumstances would permit,

the news media began dissemination of information to the public by their several means of communication. There were no immediate suspects and the early releases in no way dealt with the respondents but only with the tragic events of the weekend. With the killer still unknown and at large, there was an uneasiness and even fear among the residents in the city which continued until news was released that three suspects had been arrested and charged with the double murder.

■ In support of their motion the respondents placed in evidence copies of the Bangor Daily News, a newspaper of general circulation in Penobscot County. These exhibits which were the six issues published between October 19, 1964 and October 24, 1964 and the issue published on November 5, 1964 contain fair and factual reporting of events as they transpired. In the newspaper published on October 22nd there appeared in the body of the story on an inside page a portion of the admissions given by Corey to the police implicating the respondents. An article, also on an inside page of the October 23rd issue, quoted the county attorney as reporting that investigators had "unearthed major new evidence during the day to solidify their case against three Bangor men charged with the bludgeon slaying." The article continued with speculation that the police had recovered the stock certificates believed to be missing from the Morris home. We are not satisfied that these two departures from what may be properly regarded as fair pretrial reporting, not having been repeated or unduly emphasized or featured in headlines, served to create such a climate of hostility and prejudice against the respondents as to make a fair trial in Penobscot County virtually impossible.

■ Also presented as exhibits were copies of two magazines, Official Detective Stories and Front Page Detective (issues for February, 1965). There is no satisfactory evidence that these publications, each containing a story based on the investigation of the Morris murders, were read by any substantial number of residents of Penobscot County or that they had any appreciable effect on the community attitude within the county toward the respondents.

With one exception, of which more later, television and radio news coverage during the period as reflected in news reports which are exhibits here was for the most part confined to the reporting of facts and was relatively free of sensationalism or gratuitous expressions of opinion with respect to the guilt of the respondents. Moreover, active broadcasting coverage of the case was of relatively short duration and had ceased to be a factor in affecting community opinion after the probable cause hearing ended in early November, 1964. Some time during the week of October 18, 1964 (the exact day is not in evidence), however, the local television station produced a "documentary" film and narration in cooperation with the law enforcement officials covering the investigation of the Morris case and culminating with the booking of the State's witness, Corey, and the two respondents at the police station. This program lasted between ten and twenty minutes. It was shown but once. It constituted the principal item of evidence relied upon by the respondents as they sought to demonstrate that the news media had created an atmosphere which precluded the empaneling of a jury free of bias and prejudice. The film and script present a remarkable demonstration of many things officials charged with law enforcement should *not* do as they deal with the news media as well as many things the responsible news gatherer should *not* do if he would maintain some reasonable balance between a "free press" and a "fair trial". The narrative simply assumes the guilt of the respondents. It employs such sweeping accusations as "The trio *responsible for the vicious crime* have been identified by the Penobscot County Attorney's Office as (naming Corey and the respondents)"; "The quick apprehension of the *trio of killers* etc."; "This close coopera-

tion of the law enforcement bodies *closed the vicious crime and brought those responsible to justice* in slightly over three days"; "The officers' determination to bring *those responsible before the Bar of the law* has now paid off with the quick arrest of *those accused of the brutal slaying*"; "Only moments after his confinement, the number one suspect (Corey) startled the investigating officers by revealing *that he had accomplices in the crime*"; "The bloodstained clothing, which *reportedly* had been worn *by the number two suspect* during the crime, was one of the leading bits of evidence *that finally condemned the trio*"; "It was during this search (of a camp being shown on screen) that the officers received their first big break *that definitely connected the trio with the slaying*"; "* * * two stock certificates * * * forming a direct link *between the slaying and the three killers*"; "Simon Coty (respondent here), according to Corey's Statement, was the man *who inflicted the death blows*"; "The *third killer* of the group, Milton R. Swett, 33, of Bangor (respondent here), was *pointed out by his accomplices* as the driver of the car"; "The location of the murder weapon, coupled with blood stained clothing, and the stock certificates at the cabin *nearly closed the case against the trio*"; "Each of the respondents appearing in court today faced a double charge of murder, which practically assures, if they are convicted, *that they will all serve life sentences in Maine State Prison*"; "It is the opinion of this reporter that the local law enforcement agencies cannot be complimented enough for their efficiency in the quick and professional apprehension *of the trio of killers*. TV2 News would like to thank the officials in charge of the murder investigation *for their cooperation* in allowing the TV2 News staff to film the highlights of their relentless search for the killers and present this public report." (Emphasis ours.)

It must be kept in mind that this most unusual narration, from which we have selected only brief excerpts, accompanied the showing of a film which portrayed the officers as, step by step, they pursued their investigation. The viewer became a witness in the house with the bodies of the victims on display. He was taken on tour of the ransacked and disordered rooms. He examined the murder weapon and observed the making of chemical tests upon the clothing of the suspects. He watched as the officers painstakingly searched the cabin and the surrounding area. He observed the examination of the car owned by respondent Swett and observed the respondents as they were taken into the police station and later as they were removed to the District Court. It should be noted and may properly be emphasized, however, that this "documentary" did not transmit the voices of the respondents or any other participants whose pictures were shown. The only voice heard was that of the commentator.

In addition to offering the exhibits above described, the respondents presented the testimony of certain witnesses. As explained to the presiding justice the respondents employed the technique of presenting as witnesses certain citizens of the county who had been chosen at random and served with summons. There had been no prior discussion with these witnesses on the part of respondents' counsel or anyone else to determine in advance what their testimony would be. We are satisfied that the method employed was a fair and effective means of obtaining a representative cross-section of public opinion and the extent of bias and prejudice against the respondents, if any. We are satisfied that the justice below could properly draw certain conclusions from this testimony tending to support his later determination not to order change of venue. The memory of witnesses tended to be vague with respect to any specific details of the crime. In general, the witnesses had either not seen the single presentation of the television "documentary" or had not been so impressed with it as to form any feeling of active hostility or prejudice toward the respondents. Such feeling of "relief" as they experienced when the respondents were arrested and their assump-

tion that the "right men" had been apprehended seems to have been grounded primarily on their confidence in the experience and integrity of the police rather than on any "evidence" or opinions presented by the news media. We cannot equate such an assumption with the creation of a climate which renders a fair trial impossible. The justice below could also conclude that with the passage of about three months after publicity had virtually ceased, the public memory had dimmed to the point that the prevalence of fixed opinions as to the guilt of the respondents was not appreciably greater in Penobscot County than elsewhere. The justice below concluded that in the atmosphere then existing the use of *voir dire* and all other usual safeguards employed in the selection of a jury would adequately protect the rights of the respondents and assure them a fair trial.

In recent years courts have encountered increasing difficulty in maintaining a fair and reasonable balance between the rights of the news media and the rights of litigants. Nothing is more important or more indispensable to good government in this nation than a press free to discover, to know and to publish the truth in order that we may have an informed citizenry. Courts have been vigilant to protect the press against any encroachment upon these rights, even the right to make proper and critical analysis of decisions of the court itself. On the other hand a person charged with crime is constitutionally entitled to be tried by a court, not by the news media, and under conditions which meet all the requirements of due process of law. Dependent as it is upon constitutional protection, the press should be even more sensitive and zealous to protect the constitutional rights of other citizens, including the right to a fair trial, than is the general public. A responsible press, like the courts, is given great power for good and for evil, and with great power goes great responsibility, responsibility for self discipline and balanced judgment. Law enforcement officials are too often eager to enhance their own prestige or political fortunes by prematurely releasing information or opinions which in effect make the news media the trial forum rather than the courtroom. Courts are universally and outspokenly critical of officials who thus diminish or destroy their effectiveness in the prosecution of a case. When such ill conceived and irresponsible "cooperation" is offered by officials, a responsible press should exercise restraint and decline to publish that which will clearly tend to invade the constitutional rights of any citizen. The task of the courts in providing a fair and impartial trial is arduous and difficult enough under the most favorable circumstances and it seems not unreasonable to expect of all prosecuting officials, all counsel and all news media such a wise and restrained use of information and publicity as will serve to aid the courts in the discharge of their difficult role. When pretrial publicity is so extreme as to jeopardize the right to a fair trial, courts are presented with difficult alternatives. If trial is delayed to permit the advance effect of publicity to wane, witnesses may die or disappear, evidence unexpectedly found to be necessary may be unavailable, and the respondent may be forced to abandon his right to a speedy trial in order to assure himself a fair trial climate. If the trial is removed to another venue, the removal is usually attended by greatly increased expense and inconvenience for all concerned. Courts, officials and the press alike owe a plain duty to the public to create no impediment to the holding of a criminal trial in its most natural, logical and advantageous location, in the county where the crime was committed.

Under ordinary circumstances the determination with respect to a change of venue is within the sound discretion of the presiding justice and his decision with respect thereto will not be reversed in the absence of a showing of abuse of that discretion. There is no "conclusive presumption" of prejudice. State v. Hale (1961), 157 Me. 361, 365, 172 A.2d 631. In Hale

we touched upon the problem of a "free press and a fair trial" in these terms: "News media are fully protected in their right to report the facts of any case as they occur. Difficulty arises, however, whenever there is a publication of what amounts to surmise and conjecture as to what may be offered and admitted as legal evidence at a later trial. We deplore, as do all courts, the giving of statements for publication in advance of trial by public officials as to the nature of what they deem to be evidence in their hands. We have in mind especially the disclosure by prosecuting officials of alleged confessions and admissions which may or may not ultimately pass the rigorous test of admissibility. Any incident which involves what is often termed 'trying the case in the newspaper' or other news media imposes a great and unnecessary burden on courts which are charged with the duty of providing an atmosphere in which a respondent may receive a fair and impartial trial."

■ We turn now to a consideration of the circumstances under which the rule of ordinary application as expressed in Hale must yield to constitutional requirements, in particular the requirements of the fourteenth amendment to the Constitution of the United States. Until 1961 the United States Supreme Court had had no occasion to upset a conviction in a state court because of the effect of pretrial publicity. In Irvin v. Dowd (1961), 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, however, such a situation arose. In Dowd, a post conviction relief case, the Indiana court had granted a change of venue but only to the adjoining county which the Supreme Court concluded was as badly infected by adverse pretrial publicity as was the county of original jurisdiction. A further change of venue to a more remote county had been denied. In this case "police officials (had) issued press releases, which were *intensively* publicized, stating that the petitioner had *confessed* to * * * six murders." (Emphasis ours.) Mr. Justice Clark, writing for a unanimous court, recognized at the outset

that prospective jurors cannot be expected to have been immunized from all knowledge of a case. He said at page 721 of 366 U.S., at page 1642 of 81 S.Ct.: "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." On the facts of Dowd, however, the court concluded that prejudice was "manifest" and that there was a "build up of prejudice" created by the news media and prosecuting officials which was "clear and convincing." There was a "barrage" of adverse and accusatory publicity directed at the respondent "during the six or seven months preceding his trial" and culminating "[o]n the day before the trial" with a story that he had "orally admitted the murder" with which he was charged. The court laid emphasis upon the results of *voir dire* as reflecting the "pattern of deep and bitter prejudice" shown to be present throughout the community. Out of a panel of 430, 268 prospective jurors were excused for cause and 90% of those examined on the point "entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." In fact, eight out of the twelve jurors ultimately selected thought the petitioner was guilty. On these facts, then, the Supreme Court concluded that "the finding of impartiality (of the jury) does not meet constitutional standards."

So also in Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600,

where massive adverse publicity not only preceded the trial but pervaded the trial itself while it was progressing, the Supreme Court required that respondent be tried anew.

We are satisfied that Dowd and Sheppard are not controlling here. Excluding the television "documentary" with which we will deal separately, the balance of pretrial publicity contained little more than normal and factual coverage of the news with respect to these murders. It lacked the continuous and persistent vehemence and intensity which tends to infect a whole community. It had virtually subsided about three weeks after the crimes were committed and over three months before the trial began. Moreover, the *voir dire* can be fairly assumed to have disclosed no prejudice or fixed opinion on the part of the jurors selected to sit; nor, we assume, did it disclose the manifest effects which would ordinarily be present in a community so saturated in antagonism and hostility toward the respondents that genuine impartiality is unattainable. We say "assume" because the respondents have not seen fit to bring up the *voir dire* record in its entirety. We note, however, that only 84 prospective jurors were required to produce a panel of twelve jurors and two alternates. In short, one person out of six called was found acceptable, a ratio which in a murder case involving two respondents being tried together would seem to us to negative any suggestion that public hostility was an appreciable factor. With the jury and alternates finally chosen, the presiding justice made inquiry and was assured that the jury was then satisfactory to both respondents and their counsel.

We conclude that the situation presented in the instant case was very different from that in Dowd but more closely resembled that found in Beck v. Washington (1962), 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98. In that case the Supreme Court refused to disturb a state court conviction under attack because of the alleged effect of pretrial publicity. The Court looked at both the quantity and quality of the publicity. It found the portions adverse to the petitioner to be "neither intensive nor extensive." For the most part newspaper accounts were "straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness." The Court also deemed that the *voir dire* and its disclosures as to the number of people holding a fixed opinion as to guilt or bias toward the petitioner were significant and revealing as to any prejudicial effect of publicity. In summation the Court said at page 557 of 369 U.S., at page 964 of 82 S.Ct.: "We cannot say the pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law." In our view this is a fair summation also of the conclusions properly to be reached in the instant case.

█ In Rideau v. State of Louisiana (1963), 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed. 2d 663, a television program of about twenty minutes duration presented a discussion in the office of the sheriff in the course of which the accused confessed. In this case the television station transmitted both picture and sound. The program was shown once a day for three days and although the number of actual viewers could not be known or ascertained, it was estimated that there was a potential audience of 106,-000 people in an area in which there were 150,000 residents from whose number the jury was to be selected. The constitutional waters were further muddied by the fact that two members of the jury were "honorary" deputy sheriffs. Moreover, when counsel for the respondent sought to challenge for cause three jurors who had seen the televised program and also sought to challenge for cause the two "honorary" deputy sheriffs, peremptory challenges having then been exhausted, these requests were denied. The Supreme Court deemed the televised activities in the sheriff's office to be "kangaroo court proceedings"

amounting to a "trial" not held in a courtroom presided over by a judge and at which there was no counsel to advise the respondent of his right to stand mute. As a result the Court felt that "(a)ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." It deemed the circumstances to be such a flagrant violation of constitutional safeguards, that it declined to examine a particularized transcript of the *voir dire* examination. In the case before us the respondents vigorously contend that Rideau controls and should govern our decision. We cannot agree. On the contrary Rideau seems to us readily distinguishable upon its facts. It is evident that the justice below took a very serious view, as do we, of the television "documentary" which furnished the principal basis of the respondents' demand for change of venue. He took every proper precaution to make certain that no adverse effects of this program entered the jury room. He could properly consider that the "documentary" had been shown but once and that it did not transmit the voices or conversation of any participants. He could take account of the fact that it was viewed by a limited audience at a point in time months removed from the date of trial. The evidence supported a finding that at the time of trial whatever effect it may have had originally had been greatly diluted and diminished and the memory of it, even on the part of those who had once seen it, had grown dim. It did not, of course, contain the admissions or confessions deemed so vital in Rideau. Finally, and most importantly, the presiding justice permitted the respondents to challenge for cause any prospective juror who had seen the entire film or any objectionable parts of it, and this without any invasion of their usual number of peremptory challenges. Although we feel compelled to reiterate our criticism and condemnation of this "documentary" or any other ill considered acts of officials or the news media which place unnecessary obstacles in the path of justice, we nevertheless find that the safeguards which were seasonably employed by the court below were adequate to overcome any residual effects of the "documentary" and insure the respondents a fair trial. We are satisfied that the circumstances were not such as take the case outside the rule in Hale, and, no actual prejudice having been shown, decision rested in the sound discretion of the presiding justice.

## SEPARATE TRIALS

The two respondents were separately indicted for the same murder and the same robbery. Over their objection the indictments were consolidated and tried together. In fact, the respondents filed motions for separate trials which were denied. Respondents now assert that this ruling constituted reversible error.

In Commonwealth v. Kloiber (1954), 378 Pa. 412, 106 A.2d 820, 822 (cert. den. 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688) the court said: "The trial Judge because of his position and for other obvious reasons has been given a discretion to determine whether a number of bills of indictment should be consolidated and tried together, and his exercise of discretion in such matters will not be reversed by an appellate Court unless there has been a manifest abuse of discretion or a joint trial is so unfair as to be clearly unjust and prejudicial to one or more of the defendants. Especially is a joint trial permissible, if not advisable, when the crimes charged grew out of the same acts and much of the same evidence is necessary or applicable to both defendants."

The same rule was announced in Commonwealth v. Gallo (1931), 275 Mass. 320, 175 N.E. 718, 79 A.L.R. 1380 and State v. Manney (1958), 26 N.J. 362, 140 A.2d 74 (reasoning supporting Rule of Court making consolidation discretionary).

▮▮▮▮ The underlying principles are basically the same as those involved when an indictment charges several defendants

and severance is demanded. In State v. Bobb (1942), 138 Me. 242, 255, 25 A.2d 229, 236 we held with respect to this situation that "the grant or denial of a motion for separate trials rests in the trial court's discretion and is reviewable only for abuse; that a denial of separate trials when it is not clearly shown that defenses were necessarily antagonistic or that the defendants would be prejudiced by joint trial is not error; further that what constitutes abuse of discretion in denying separate trials depends upon the whole situation in each case."

■ The respondents are unable to point to any specific instance where prejudice resulted and our reading of the record discloses none. We find no abuse of the discretion exercised by the justice below.

## SUPPRESSION OF EVIDENCE

■ Both respondents seasonably filed motions to suppress evidence alleged to have been obtained by unlawful search and seizure. Both motions were denied. In the case of Swett, however, the evidence complained of was not introduced at trial and no issue as to illegally obtained evidence is raised by him on this appeal. In the case of Coty, he complains of the introduction into evidence of certain grocery items found by the officers in the cabin above referred to. The argument comes from the respondent himself rather than from his counsel who by his brief has faithfully transmitted it to us. Suffice it to say that the evidence makes it clear, and the justice below could so find, that the cabin was owned by third parties who had no knowledge of and gave no permission for its occupancy by Corey and the two respondents. In short the respondent Coty was a mere trespasser on the premises and could not be heard to complain if officers searched the premises with or without a warrant. In extending the right to suppress evidence to one "legitimately on the premises", the United States Supreme Court in Jones v. United States (1960), 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 nevertheless denied this right to trespassers and said: "This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched." Such is this case. There was no error.

## PHOTOGRAPHS

■ Respondents assert error in admitting over their objection photographs of the interior of the Morris home which include the bodies of the deceased. "The law is well settled that the mere fact that a photograph is gruesome is not a reason for its non admission * * *. The presiding justice has great latitude and discretion in determining the admissibility of photographs and unless there is shown an abuse of discretion, his ruling will not be disturbed on exceptions." State v. Ernst (1955), 150 Me. 449, 454, 114 A.2d 369, 373; State v. Duguay (1962), 158 Me. 61, 65, 178 A.2d 129. The photographs here were shown to be accurate representations of what they portrayed and were pertinent to the issues under consideration. We see no abuse of discretion.

## RIGHT TO TRIAL

Over the objection of the respondents certain indictments charging respondents with the murder of Edward I. Morris and with entering a dwelling house without breaking were placed on file. In each instance the respondent demanded and was refused an immediate trial. The claim of error is unrelated to the convictions here under review and in a sense is premature. The record shows the demand made for speedy trial as was required by State v. Kopelow (1927), 126 Me. 384, 386, 138 A. 625. It will be available if and when the State moves for trial on the cases filed. We neither intimate nor suggest what our ruling might be if the issue should be tendered on a later prosecution. The filing of the cases during the time required for trial and review upon appeal of the com-

panion cases now before us was reasonable and proper. However, in the light of the reasoning employed by the Supreme Court in the very recent case of Klopfer v. State of North Carolina (opinion March 13, 1967) 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1, it would appear that if, following certification of our decision in the instant case, either respondent should renew his motion for immediate trial as to either or both of the filed cases, the Court below should require the State to proceed to trial forthwith or dismiss the indictments in the cases now on file.

## CROSS EXAMINATION

■ Respondent Swett, having submitted himself to direct and cross examination as a witness in his own behalf, was after an interval returned to the witness stand for further cross examination. His objection thereto was noted. It is now *his* contention as transmitted to us by his counsel that once having left the witness stand, his right not to incriminate himself had reasserted itself and he could not again be required to submit to examination. It suffices to say that the argument is ingenious rather than meritorious. Once having elected to take the witness stand in his own behalf, the respondent waived his constitutional right against self-incrimination and thereafter was required to submit to proper cross examination until the same was deemed by the presiding justice to be completed.

## APPEAL

■ The respondents filed motions for new trial from a denial of which appeal is taken. The evidence amply supports a finding by the jury that Corey and the two respondents went to the Morris home with a loaded sawed-off shotgun with the intent and design of robbing the occupants thereof; that Corey and respondent Coty entered the house while respondent Swett kept watch outside; that while in the house Coty attacked and murdered both

the Morrises and that he and Corey took property from the house and from the persons of their victims; that Swett with knowledge of the crime assisted in the escape by driving his accomplices in his car; and that all three shared in the concealment and division of the loot. On the basis of this evidence both respondents were guilty of both robbery and felony-murder. State v. Rainey (1953), 149 Me. 92, 97, 99 A.2d 78.

Appeal denied.

RUDMAN, J., did not sit.