STATE of Maine

v.

Benjamin C. POWERS and Lawrence W. Powers.

Supreme Judicial Court of Maine.

May 18, 1978.

Michael E. Povich, Dist. Atty., Ellsworth, for plaintiff.

Peter Avery Anderson, Bangor, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, WERNICK and ARCHIBALD, JJ.

DUFRESNE, A. R. J.[1]

Tried jointly before a Hancock County jury, the Powers brothers, Lawrence and Benjamin respectively twenty-three (23) and twenty-six (26) years of age, were found guilty of the following criminal charges: Lawrence was convicted of the crime of assault and battery of a high and aggravated nature upon the person of Douglas E. Gray in violation of 17 M.R.S.A., § 201[2] and of attempting to break arrest from the custody of James E. Brown, a coastal warden, in violation of 17 M.R.S.A., § 1405 and 17 M.R.S.A., § 251;[3] Benjamin

---

1. Mr. Justice Dufresne sat at oral argument and participated in consultation while he was Chief Justice, and, on order of his successor, Mr. Chief Justice McKusick, was empowered and authorized to continue his participation in the case in his capacity of Active Retired Justice.

2. 17 M.R.S.A., § 201

"Whoever unlawfully attempts to strike, hit, touch or do any violence to another however small, in a wanton, wilful, angry or insulting manner, having an intention and existing ability to do some violence to such person, is guilty of an assault. If such attempt is carried into effect, he is guilty of an assault and battery. Any person convicted of either offense, when it is not of a high and aggravated nature, shall be punished by a fine of not more than $100 or by imprisonment for not more than 6 months, or by both. When the offense is of a high and aggravated nature, the person convicted of either offense shall be punished by a fine of not more than $1,000 or by imprisonment for not more than 5 years, when no other punishment is prescribed."

17 M.R.S.A., § 201, effective at the time the events took place, was repealed by Public Laws, 1975, c. 499 § 5 and replaced by 17–A M.R.S.A., §§ 207 and 208 which took effect on May 1, 1976.

3. 17 M.R.S.A., § 1405. This section provided in part as follows:

"Whoever resists apprehension or breaks arrest shall be punished by a fine of not more than $1,000 or by imprisonment for not more than 11 months."

was convicted of two charges of simple assault and battery, one upon the person of John L. Cousins and one upon the person of Douglas E. Gray, in violation of 17 M.R.S.A., § 201; also of the crime of attempting to break arrest from the custody of Douglas E. Gray in violation of 17 M.R.S.A., §§ 1405 and 251; and lastly of the misdemeanor commonly referred to as driving to endanger in violation of 29 M.R.S.A., § 1314.[4]

Both defendants appeal from the ensuing judgments of conviction, raising the following contentions:

1) the presiding Justice committed reversible error in his instructions to the jury in relation to the offense of attempting to break arrest;

2) the evidence was insufficient to support verdicts of guilty of attempting to break arrest and, thus, it was error to deny their motions for acquittal;

3) their motions for mistrial and severance of their trial from the trial of their codefendant, Galen L. Thompson, Jr., should have been granted, and it was error to refuse them separate trials;

4) new trials should be granted, because they were denied the effective assistance of trial counsel.

We deny the appeals.

*Facts*

In the evening of July 26, 1974 in the Town of Stonington, there was a dance at the gymnasium of the local high school, while the defendants and their friends were attending a party in another section of the community. The record reveals that hard liquor and beer flowed freely at the party.

During the course of the evening Douglas Gray, Chief of Police for the town, together with his part-time constable, John Cousins, visited the gym to check out the dance. When they returned to the police cruiser, they noticed that the cruiser's windshield had been broken during their absence. Chief Gray then communicated by police radio with James E. Brown, a coastal warden for the Department of Marine Resources. As Gray and Cousins were leaving the area, they were flagged down by two individuals who informed them of the identity of the person who had broken the windshield. The named individual was a seventeen year old youth whom the officers found, on their return to the school parking lot, sitting on the hood of a vehicle. Chief Gray testified that the boy was intoxicated. Taken into custody by the police, the teenager was brought home and released, but, instead of turning in for the night, the boy elected to go to the party where the defendants and a number of other acquaintances were. Rumors of police maltreatment of the juvenile had already reached the group at the party and when the boy joined the affair tempers seemed to rise.

Warden Brown and David Black, who was also a warden, had responded to Chief Gray's prior summons for help and were in the yard of Cousins' Garage located at the intersection of Main Street and Atlantic Avenue in Stonington discussing the situation with the police chief and his assistant, when the defendant, Lawrence Powers, appeared with three other individuals. Chief Gray was asked by Galen Thompson, so Lawrence testified, if it were true that the chief had pushed the juvenile off the car and had pulled him by the hair in doing so,

The crime of attempt, 17 M.R.S.A., § 251, at the time of the occurrence, read as follows:

"Whoever attempts to commit an offense and does anything towards it, but fails or is interrupted or is prevented in its execution, where no punishment is expressly provided for such attempt, shall, if the offense thus attempted is punishable with imprisonment for life, be imprisoned for not less than one nor more than 10 years; and in all other cases he shall receive the same kind of punishment that might have been inflicted if the offense attempted had been committed, but not exceeding ½ thereof."

Section 1405 was repealed by Public Laws, 1975, c. 499, § 7 and replaced by 17-A M.R.S.A., § 755, while section 251 was repealed by Public Laws, 1975, c. 499, § 5 and replaced by 17-A M.R.S.A., § 152.

4. 29 M.R.S.A., § 1314.

"No person shall drive any vehicle upon a way in such a manner as to endanger any person or property."

This statute was amended by Public Laws, 1975, c. 731, § 52, effective May 1, 1976.

to which the officer was said to have replied that it was not so and, besides, that it was none of his business and to get out.

Nothing unusual happened on this first encounter. But, later on shortly before midnight, a group of twelve to twenty young people, including Galen Thompson and the Powers brothers, were at Cousins' Garage to protest the police treatment of the juvenile. A noisy and somewhat violent confrontation was developing; so, Chief Gray used chemical mace to compel the group to disperse as ordered. At that point, seven or eight persons piled in the Powers' Pontiac with Benjamin Powers driving and Lawrence Powers on the hood outside. The police testified that the car took off down Atlantic Avenue at a high rate of speed, with squealing tires and swaying back and forth on its course.

The police cruiser and the wardens' vehicle started in hot pursuit. Reaching the Pontiac shortly after it stopped in an ocean front parking lot at the end of Atlantic Avenue, Chief Gray approached Benjamin Powers already out of his car and informed him that he was under arrest for driving to endanger. Benjamin demurred saying he was not going anywhere with the officer. He then turned around and was about to descend an embankment leading towards the ocean, when Officer Gray grabbed him by the collar and pulled him back. The evidence, taken in the light most favorable to the State, does show that the officer never lost his grip upon Benjamin Powers, even though brother Lawrence came to the rescue and landed a punch to the Chief's face which caused the officer to bleed profusely. While Warden Brown intervened by grabbing Lawrence Powers and informing him that he was under arrest, Constable Cousins, noting that Chief Gray was in a dazed condition, came to the assistance of the Chief and took charge of the Chief's prisoner, Benjamin Powers, and started to walk him over to the police cruiser, but, prior to their reaching the cruiser, Benjamin struck Constable Cousins twice on the left cheek in an attempt to break away.

Warden Brown's arrest of the defendant, Lawrence Powers, was not to be without difficulty. A struggle followed. Lawrence broke away from the warden's grasp and succeeded in striking Chief Gray again several times.

Seeing the encounter going against them, both Chief Gray and Warden Brown unholstered their revolvers to maintain the arrests. From that point on, neither the Powers brothers, nor the codefendant Galen Thompson and a juvenile, persisted in their efforts to escape arrest.

### 1. *Jury Instructions*

■ The defendants' first argument on appeal is that the presiding Justice erred in his charge to the jury respecting the offense of attempt to break arrest. They concede, however, that this claim of error is being raised for the first time at the appeal level, as they admit no objections were made at trial before the jury retired to consider its verdict concerning any omissions in the Justice's charge as mandated by Rule 30(b) of the Maine Rules of Criminal Procedure. Our inquiry under such circumstances is limited, pursuant to Rule 52(b), M.R.Crim.P., to a determination whether the given jury instructions as viewed in their entirety constituted error so seriously prejudicial as to tend to produce manifest injustice, i. e. obvious error affecting appellants' substantial rights. *State v. Armstrong*, Me., 344 A.2d 42, 49 (1975); *State v. Scott*, Me., 343 A.2d 177, 178 (1975); *State v. Collins*, Me., 297 A.2d 620, 631 (1972).

Such is the standard we shall use in deciding the defendants' claim on appeal that the Justice's instructions were such as to exclude the jury's consideration of an essential element of the crime charged or as tending to give the jury an erroneous concept of the necessary ingredients thereof. See *State v. Pratt*, Me., 309 A.2d 864, 865 (1973).

First, the contention is made that the Court's instructions did not provide the jury with the necessary information respecting the constituent elements of an attempt as proscribed by 17 M.R.S.A., § 251. We disagree.

We concede that the breach of our attempt statute requires proof of two things: 1) a specific intent to commit a particular crime and 2) an act moving directly toward the perpetration of the substantive offense intended.

■ It is the general rule that, in a prosecution for a criminal attempt, the State must prove, first, that the defendant actually intended to do a particular thing which at common law or by statute is a crime and, second, that he did an overt act constituting a substantial step toward the commission of the crime. The overt act must in the eyes of the actor be adapted to or suitable for the purpose and must have reached far enough toward the accomplishment of the desired result that in the ordinary and likely course of things, given the contemporaneous intent to consummate the criminal act, the perpetrator would be in a direct unequivocal movement toward the commission of the offense. Both the intent and the overt act as essential elements of attempts to commit criminal offenses must be closely connected with each other, i. e. they must coincide in time. See *Duncan v. State,* 158 Me. 265, 275, 183 A.2d 209 (1962); *State v. Curry,* 43 Ohio St.2d 66, 330 N.E.2d 720, 725 (1975); *State v. Harvill,* 106 Ariz. 386, 476 P.2d 841 (1970); *State v. Davis,* 108 N.H. 158, 229 A.2d 842, 844 (1967); *State v. Lewis,* 69 Wash.2d 120, 417 P.2d 618 (1966); *State v. Mazzadra,* 141 Conn. 731, 109 A.2d 873, 875 (1954); *Nemecek v. State,* 72 Okl.Cr. 195, 114 P.2d 492, 135 A.L.R. 1149 (1941); *People v. Miller,* 2 Cal.2d 527, 530, 42 P.2d 308, 309, 98 A.L.R. 913 (1935); *Gustine v. State,* 86 Fla. 24, 26, 97 So. 207, 208 (1923).

■ Although the presiding Justice did not expressly inform the jury that a specific intent to commit the attempted crime was an essential element of the offense of attempt to break arrest, such omission in the instant case did not amount to obvious error within the meaning of Rule 52(b), M.R. Crim.P. In his instructions to the jury, the Justice told them that, in order to convict the defendants of the reference crime, they had to find that the accused "did attempt to break arrest." This emphasis placed on the fact that the defendants must have attempted to break arrest as one of the prerequisites to conviction *in itself* conveyed to the jury that it was necessary for them to find not only objective conduct on the part of the defendants that proved an attempt to break arrest, but also the presence of a subjective intent to do so. These words in the context in which they were used by the trial Justice, we believe, were understood by the jury to encompass both an overt act to break arrest and a concomitant intent to do so as preliminary prerequisites to a finding of guilty of the crime of attempt to break arrest. See *State v. Weleck,* 10 N.J. 355, 91 A.2d 751, 760 (1952).

This Court did agree that such was so in reference to the sufficiency of an indictment, when it said in *Moody v. Lovell,* 145 Me. 328, 337, 75 A.2d 795, 799 (1950):

"An attempt to do an act necessarily includes an intent to do the act. An allegation that one attempted an act *ex vi termini* alleges an intent to do the act." (Emphasis in original)

See also *State v. Jones,* 125 Me. 42, 130 A. 737 (1925).

If an indictment couched in terms of "attempt" is viewed legally sufficient in meaning to comprehend both an intent to commit the criminal offense charged and an act done in pursuance of such intent so that it constitutes adequate information to an accused of reasonable and normal intelligence respecting the criminal accusation and the nature thereof, we must conclude that an instruction couched in identical terminology should carry to the jury ordinarily composed of persons of reasonable and normal intelligence a similar message.

■ It is further contended that the Justice below should have instructed the jury specifically to the effect that, in order to support a conviction of attempt to break arrest, the State must prove, not only an intent to do so, but also that the defendant did some overt act moving directly toward the perpetration of the crime of breaking arrest. We concede that the instructions in

this respect were crisp and not too elaborate. But, absent a request for a more explicit definition of the crime, the Justice's instructions to the effect that the charge of attempting to break arrest means "to try to break arrest," "an attempting to get away," were sufficiently informative to overcome a claim of manifest error. Such language necessarily conveyed to the jury that some specific overt act moving directly toward the furtherance of the intent to break arrest had to be done before a conviction of attempt to do so could be found. The words "attempt" and "try," in their broadest signification, mean a physical effort to do a particular thing. An attempt is an overt act itself. *State v. Martin,* 14 N.C. 329, 330; *Lewis v. State,* 35 Ala. 380, 388. See also *Logan v. State,* Me., 263 A.2d 266 (1970).

Furthermore, even if the trial Justice had given the jury a more complete and detailed definition of a criminal attempt, we see no reasonable possibility that different verdicts would have resulted. We are satisfied beyond a reasonable doubt that the defendants suffered no prejudice on this score. See *State v. McKeough,* Me., 300 A.2d 755, 761 (1973).

Finally, the defendants would fault the presiding Justice for his failure, as they contend for the first time on appeal, to provide the jury with well-defined guidelines regarding the several types of situations wherein legal arrests may be said to have been consummated. The charge in relation to this question was brief and to the point:

"Now, when you arrest somebody, you may put your arm on them and say 'you're under arrest.' You don't have to touch them, [however] but [if you don't] they have to be close enough to you so that your presence and what you say to them constitutes an arrest. [In any case] you have to inform them that they are under arrest, period. That is all you have to inform them at that time."

In *State v. Babcock,* Me., 361 A.2d 911 (1976), we reiterated the short definition of an arrest which this Court had formulated in *State v. MacKenzie,* 161 Me. 123, 210 A.2d 24 (1965), describing an "arrest" as follows:

"To constitute an arrest there must be either a physical seizure of the person by the arresting officer, or a submission to his authority and control."

This short-hand concrete conception, however, was not intended to detract in any way from the full definition of an "arrest" as quoted with approval in *State v. MacKenzie,* supra:

"The elements of an 'arrest' comprehend a purpose or intention to effect an arrest under a real or pretended authority, the actual or constructive seizure or detention of the person to be arrested by the one having the present power to control him, communication by the arresting officer to the one whose arrest is sought of his intention or purpose then and there to make the arrest, and an understanding by the person who is to be arrested that it is the intention of the arresting officer then and there to arrest and detain him."

Viewed in the light most favorable to the State, the evidence discloses that, as Chief Gray approached Benjamin Powers, he did inform him that he was under arrest for driving to endanger and, before Benjamin could get away from him, the officer grabbed him by the collar when it became evident that Benjamin would not submit to arrest, bringing him to his knees. Warden Brown, on the other hand, seized Lawrence Powers after Lawrence struck Officer Gray, and he informed Lawrence at that time that he was arresting him.

No claim is made that the arresting officers did not communicate to the defendants their intentions to arrest them or that the defendants did not so understand that the arresting officers wanted then and there to arrest and detain them. Rather, both defendants contend that, since they resisted arrest and failed to submit from the beginning and had broken loose from the officers' grip, the arrests were not consummated until the officers pulled guns on them, at which time the defendants did submit without further resistance. Because no attempt

to break arrest by either defendant was made thereafter, they claim that the jury instructions as given were erroneous as applied to this case. We disagree.

The Justice expressly told the jury that they were not dealing with a charge of resisting arrest, but that, before they could find either defendant guilty of attempt to break arrest, the State had to prove beyond a reasonable doubt that the particular defendant had actually been arrested prior to attempting to break the arrest. In this, the Justice below was correct, and, absent a request for a more elaborate explanation of the several ways of effectuating an arrest, we cannot say that the defendants under the facts of this case were in any way prejudiced.

It is true that merely saying to a person—you are under arrest—without an effective physical restraint of the person concomitant with the proclamation will not constitute an arrest of the person. On the other hand, these same words—you are under arrest—are sufficient to effect an arrest of the person, if the person to be arrested is in the presence and power of the officer and in consequence of the communication submits to the officer's restraint. In this latter instance, however, if, instead of submitting, the person flees from the officer, there would be no arrest until the officer had laid hold of the person. See *People v. Jackson*, 98 Ill.App.2d 238, 240 N.E.2d 421 (1968); *Pike v. Hanson*, 9 N.H. 491 (1838).

It is well settled law that, if the party be within the power of the arresting officer and submits to the arrest, no manual touching of the body or use of actual force is necessary to constitute an arrest. *Gold v. Bissell*, 1 Wend. 210, 215 (N.Y.1828); *Emery v. Chesley*, 18 N.H. 198 (1846); *Mowry v. Chase*, 100 Mass. 79 (1868).

In the case of each defendant, there was a physical restraint or use of actual force by the respective officer constituting a legal arrest prior to the defendants' distinct attempts to break arrest. Contrary to the defendants' contentions, it was not necessary for an arrest of the per-

son to exist in law that the arresting officers had brought their respective subject under absolute control. An officer effects the arrest of a person whom he has authority to arrest by merely laying his hand on him for the purpose of arresting him, though he may not succeed in stopping and holding him. *Whitehead v. Keyes*, 3 Allen 495, 501 (Mass.1862); *State v. District Court of Eighth Judicial District*, 70 Mont. 378, 225 P. 1000 (1924); *Price v. State*, 227 Md. 28, 175 A.2d 11 (1961).

Even though the complaint charges Benjamin Powers with the crime of attempting to break arrest "while still in lawful custody of Douglas E. Gray," there was no variance in the proof which showed that the attempt to break arrest was made while Benjamin Powers was being held by Constable Cousins. Cousins was at all times assisting Chief Gray and was under his direction and command. The fact that Cousins took over the custody of Benjamin Powers did not terminate Chief Gray's control over the defendant as Cousins was holding him for Gray. An arrest is more than a transient momentary incident. It continues through a transfer from one officer to another. The individual remains under arrest and in custody without any need for an arrest de novo by each officer delegated to maintain the custody. See *People v. Harris*, 256 Cal.App.2d 455, 63 Cal.Rptr. 849 (1967).

But the jury could also find that Benjamin Powers was arrested by Officer Gray at the very beginning, prior to the time he pulled away from the Chief to go "wash his eyes out" in the ocean, as he testified. Powers did state that the Chief grabbed him by the arm as soon as he reached him, before any conversation between them was had. Powers' declaration of intent would not be controlling on the jury, as they could determine the same as any other fact under all the surrounding circumstances.

### 2. Sufficiency of the evidence

The issue of the sufficiency of the evidence has been raised solely in connec-

tion with the defendants' convictions of attempting to break arrest. The record fully supports the jury verdicts beyond a reasonable doubt.

### 3. *Denial of motion for a mistrial and severance*

At the start of the trial, the presiding Justice ordered sequestration of the witnesses at the request of both the prosecution and the defense. After the trial had reached beyond the two-thirds mark, counsel for the Powers brother; brought to the attention of the presiding Justice notice that the attorney of codefendant, Galen Thompson, had, so it was claimed, briefed a prospective witness on prior testimony in violation of the sequestration order. After a voir-dire into the alleged incident, the Justice stated he would refer the matter to the proper authorities for possible disciplinary action. It is at this point that counsel for Benjamin and Lawrence Powers moved for a mistrial and severance of their trial from that of Galen Thompson, their codefendant. He advanced the argument that, as a result of the proffered accusations, codefendant's attorney would be antagonistic to the Powers brothers as well as to himself and his clients would not get the fair trial to which they were entitled. Thompson's attorney assured the trial Justice, however, that he harbored no animosity toward the defendants or their counsel. The denial of the motion did not constitute error.

The granting of a mistrial lies within the discretionary powers of a presiding justice and, absent a clear abuse of that discretion, the Law Court has no right to substitute its judgment for that of the trial court who has a distinct advantage in assessing the merits of the motion as a result of his immediate overview of the trial. *State v. Upton,* Me., 362 A.2d 738 (1976); *State v. Gaddis,* Me., 322 A.2d 96 (1974); *State v. Kelley,* Me., 357 A.2d 890 (1976). The same rule applies respecting the ultimate relief sought in this case such as separate trials for codefendants. *State v. Niemszyk,* Me., 303 A.2d 105 (1973), cert. de-

nied, 414 U.S. 1042, 94 S.Ct. 544, 38 L.Ed.2d 333; *State v. Coty,* Me., 229 A.2d 205, 33 A.L.R.3d 1 (1967); *State v. Bobb,* 138 Me. 242, 25 A.2d 229 (1942).

Our review of the record reveals no apparent prejudice whatsoever to the defendants from the reference incident. Hence, there was no abuse of discretion in the court's decision for the joint trial to continue.

### 4. *Incompetency of trial counsel*

The issue of inadequacy of representation by trial counsel should be presented and tried in a habeas corpus post conviction proceeding pursuant to 14 M.R.S.A., §§ 5502–5508, rather than raised on direct appeal. *State v. LeBlanc,* Me., 290 A.2d 193 (1972). From the face of the record it appears that the defendants' convictions were the result of a fair trial. The exception to the rule which permits a claim of incompetency of trial counsel to be raised on direct appeal, as recognized in *State v. Pullen,* Me., 266 A.2d 222 (1970), is not applicable here.

The entry will be

Appeals denied.

Judgments affirmed.

WEATHERBEE, J., sat at oral argument and participated in conference, but died prior to the preparation of the opinion.

POMEROY and DELAHANTY, JJ., did not sit.