**STATE of Maine**

v.

**David Conrad COLLINS.**

Supreme Judicial Court of Maine.

Dec. 8, 1972.

Peter T. Dawson, Peter Culley, Asst. Attys. Gen., Augusta, for plaintiff.

Brown & Tibbetts by Francis A. Brown, Calais, William B. Talbot, Machias, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

A Superior Court jury (Washington County) found defendant (who had pleaded "not guilty" and "not guilty by reason of insanity") guilty of unlawfully killing another human being in manner constituting murder.[1] His appeal from the judgment of conviction raises several points for decision.

I

Defendant maintains that his motion for a change of venue, grounded on allegedly prejudicial effects of pre-trial newspaper publicity, was erroneously denied.

The ruling of the presiding Justice will be upheld unless there was an abuse of sound discretion. State v. Hale, 157 Me. 361, 172 A.2d 631 (1961); State v. Bobb, 138 Me. 242, 25 A.2d 229 (1942). With broad freedom constitutionally guaranteed to the press, the evaluation entails a special sensitivity by the Courts to avoid abridgement of the rights of the press and yet to protect defendant's constitutional right to a fair and impartial trial. State v. Coty, Me., 229 A.2d 205 (1967).

Defendant has relied heavily on a claim that the pre-trial publicity described the victim of the alleged crime as a man with a family and defendant as coming from outside of Maine (from Oregon).

---

1. The evidence revealed that defendant had broken into the home of one Benjamin Flaherty while Mr. Flaherty was away. Defendant was inside the house when Mr. Flaherty returned and was seeking to enter the house. Finding himself unable to enter by the usual means of access, Mr. Flaherty had gone to the rear of the house. He was peering through an open window when defendant shot and killed him.

The information was factually correct and reported without distortion. Defendant, therefore, lacks valid basis for complaint since he points only to

> " 'straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness.' " State v. Coty, at p. 212, quoting from Beck v. Washington, 369 U.S. 541, 82 S. Ct. 955, 8 L.Ed.2d 98 (1962); Rule 21(a) M.R.Crim.P.

In further support of his position defendant adverts to the quantity of the publicity—that its sheer voluminousness made defendant well-known and easily recognized.

That a defendant already was, or was made by pre-trial publicity, a well-known or readily recognized personage in the county in which he stands charged with crime is insufficient, in itself, to establish that the denial of a change of venue is an abuse of a sound discretion to provide defendant with opportunity for a fair, impartial trial.

Absent here was any showing, most important to indicate incompatibility between the retention of the usual venue and opportunity for a fair trial to the defendant, of a

> "continuous and persistent vehemence and intensity which tends to infect a whole community" State v. Coty, 229 A.2d at p. 212

rendering

> "genuine impartiality . . . unattainable." State v. Coty, at p. 212.

Appearing in the record is the *voir dire* examination of sixty-six prospective jurors. It confirms that an impartial and unbiased jury was not only attainable but had in fact been selected.[2] Thus, the record definitively negatives

> "any suggestion that public hostility was an appreciable factor" State v. Coty, at p. 212

to preclude a fair trial to defendant and to establish as an abuse of sound discretion a denial of change of venue.

## II

Defendant next argues that the presiding Justice committed error in admitting, and allowing to remain, in evidence a written confession given by defendant to the Maine State police while defendant was in the custody of the Canadian police in Sydney, Nova Scotia.

It is undisputed that the confession had been given after the defendant (1) had in fact been told by the Maine State police of his constitutional rights as prescribed by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and (2) to all reasonable external appearances had plainly and explicitly waived those rights.

Yet, defendant argues inadmissibility of the confession because (1) he says that he had been advised of his rights by a hasty, mechanical "going through the motions" recitation from the so-called "Miranda card", and this precluded an effective understanding by him of his rights and (2) defendant had been incarcerated for a

2. Eighteen jurors were excused on peremptory challenges exercised by counsel. Of thirty-two excused for cause, generally, news publicity was the "cause" factor as to five, one of them being excused because publicity had actually caused him to form an opinion (which he stated would be difficult to overcome) and the four others because they might have been thus affected. Another five of those excused for cause were eliminated on the ground that they had formed opinions as the result of personal contacts with the victim or members of his family; and one of these was also one of the above four who might have been prejudiced by the pre-trial publicity. As to two others, decision on challenge for cause was reserved and apparently never made. Although several others of the jurors examined admitted that they had seen and heard reports of the case in the news media, none indicated that he had formed an opinion. Ultimately, fourteen of the sixty-six examined on *voir dire* were accepted as the jury panel (two as alternates).

week prior to the giving of his confession, a fact which, combined with alleged subjective mental, emotional and other behavioral infirmities of defendant is said to have: (a) rendered defendant legally incompetent effectively to waive the special rights conferred upon him by *Miranda* or (b) in any event, precluded a "voluntary" confession as required by federal Fourteenth Amendment "due process."

Defendant's claim of a hasty, casual use of the so-called "Miranda card", ineffectively communicating to defendant the full import of his constitutional rights, is without merit.

■ The record reveals clearly that defendant was informed of his constitutional rights in a manner neither perfunctory nor contemptuous. After each specification of his rights was stated, the Maine State police scrupulously inquired of defendant whether he understood. He responded affirmatively in each instance and then explicitly waived each one of his various rights. When a stenographer was later brought in so that the confession could be repeated for transcription, the warnings were again given and waived by the defendant.

The manner in which defendant was warned of his constitutional rights, as prescribed by *Miranda*, was clearly adequate and did not preclude a free and intelligent relinquishment by defendant of those rights.

■ Defendant had been confined in a jail for a week by the Canadian authorities before a detective of the Maine State police had come to Nova Scotia to talk with him. In themselves the external circumstances of defendant's incarceration cannot be said to have impaired the legal validity of defendant's purported waiver of constitutional rights.

Defendant had managed, without being detected, to cross the border between the United States and Canada, apparently in the vicinity of Montreal. He then chose, entirely of his own volition, to turn himself in to the Royal Canadian Mounted police in Sydney, Nova Scotia—informing them at that time that he was a parole violator from the United States. Thereupon, he was incarcerated in a county jail, an institution run by Canadian personnel charged only with the operation of the jail and having no responsibility for the enforcement of laws other than those relating to county ordinances.

Neither the Royal Canadian Mounted police nor any other agency in Nova Scotia was aware that defendant might have been a murder suspect in the State of Maine—at least during the period prior to the time when the Maine State police first learned of defendant's whereabouts; this was one day before a representative of the Maine State police arrived in Nova Scotia. Moreover, during this one day interval when the Canadian police might have known that defendant was a murder suspect and before the Maine State police had come to Nova Scotia, defendant was not interrogated by the Canadian police. Cf. Westover v. United States, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (companion case of Miranda v. Arizona, supra). Nothing suggests that the incarceration of defendant in Nova Scotia had been calculated, or was of a nature likely, to affect defendant's health or powers and thus "soften up" the defendant; and no external circumstances are indicated to show that the incarceration of defendant had in fact affected his health or functional capacities.

We turn, therefore, to evaluation of the possible impact of any claimed accompanying subjective mental, emotional or other behavioral deficiencies of defendant.

Defendant argues on the basis of the import of the evidence at two distinct times in the trial: first, as the evidence existed when the presiding Justice conducted a preliminary hearing in the absence of the jury and made his determinations of the confession's admissibility; and, second, as the evidence, when completed and as in-

cluding additional testimony adduced during later portions of the trial, might have required that the confession be stricken before the case was submitted to the jury.

We find it unnecessary to make the discrete time separations asserted by defendant. Even if we allow fullest play to defendant's contention, by hypothesizing defendant to have the benefit of the totality of the evidence, we conclude that the presiding Justice ruled correctly in admitting defendant's confession.[3]

■ Review proceeds on the basis that the presiding Justice will be sustained if, in accordance with the correct legal principle specifying the ultimate burden and requisite cogency of proof, the evidence provides rational support for the conclusions he reached. State v. Grover, 96 Me. 363, 365, 366, 52 A. 757 (1902); State v. Priest, 117 Me. 223, 228, 103 A. 359 (1918); State v. Merrow, 161 Me. 111, 120, 208 A.2d 659 (1965); State v. Smith, Me., 277 A.2d 481 (1971).

Hitherto, the law of Maine has failed definitively to designate the bearer of the burden, and the degree of proof necessary, to establish those factors upon which the evidentiary admissibility of a confession depends.

A passing statement in State v. Grover, supra, that at an earlier time

"the courts were ordinarily and properly quite strict in keeping from the jury evidence of confessions *when there was any reasonable doubt* of their being voluntary" (96 Me. p. 364, 52 A. p. 758) (emphasis supplied)

(because of "humanitarian" concern for a defendant who could not have counsel and could not testify in his own behalf) might properly be regarded at the time of *Grover*, when defendant could have counsel and could testify in his own behalf, as a reference to history rather than the statement of a legal principle held currently operative. See also: State v. Priest, 117 Me. 223, 228, 229, 103 A. 359 (1918).

In the more recent expositions in the Maine cases, State v. Merrow, supra; State v. Warner, Me., 237 A.2d 150 (1967); Duguay v. State, Me., 240 A.2d 738 (1968) and State v. Smith, Me., 277 A.2d 481 (1971), no attention has been directed explicitly to the degree of proof by which the presiding Justice is to arrive at his determinations of the legal admissibility of a confession—except that in State v. Warner it was said:

"No particular formula for such findings is necessary." (237 A.2d p. 166)

Implementing its earlier decision in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (constitutionally requiring preliminary determination of the factors governing the evidentiary admissibility of a confession by a tribunal other than the jury which adjudicates guilt or innocence), the Supreme Court of the United States recently decided Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L. Ed.2d 618 (1972). The Court formulated a constitutionally governing principle that the prosecution must bear the burden to establish at least by a "preponderance of the evidence" the "voluntariness" of a confession.

3. We have here chosen to overlook a serious impediment which would otherwise confront defendant's attempt to inject this issue (of the effect of the totality of the evidence) for the first time on appeal. We may note that defendant had failed to produce the additional evidence during the preliminary hearing, and before the confession was in any respect admitted into evidence, even though the evidence was then available to defendant and he had full opportunity to present it. Further, defendant had omitted to bring the issue to the explicit consideration of the presiding Justice at the close of all the evidence by a motion to strike or some other procedure of equivalent significance.

We emphasize that these matters, here passed by because they make no difference in the ultimate outcome, in other circumstances in which a difference in result might be at stake could serve to produce a decision against the defendant on procedural grounds and without consideration of the merits of his contentions.

The Court's primary reason for holding the "preponderance of the evidence" constitutionally adequate was that

> "the exclusionary rules[4] are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution's burden of proof in Fourth and Fifth Amendment suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence." (404 U.S. p. 489, 92 S.Ct. p. 626)

Lego v. Twomey prescribed a mandatory *minimum* standard. As the Court stated expressly:

> "Of course, the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake." (p. 489, 92 S.Ct. p. 627)

In assessing public policy for the State of Maine and "the appropriate resolution of the values [we] find at stake", we go beyond the objective of deterrence of lawless conduct by police and prosecution. We concentrate, additionally, upon the primacy of the value, strongly emphasized by the three dissenters in Lego v. Twomey, of safeguarding

> "' . . . the right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances.'" (p. 491, 92 S.Ct. p. 628)

Since this value has been endowed with the highest priority by being embodied in a constitutional guarantee—the constitutional privilege against self-incrimination—we believe that it must be taken heavily into account in the formulation of the public policy of this State, notwithstanding that the majority of the Justices who participated in Lego v. Twomey were unwilling to derive from it a *universal* mandate for the *federal control of every State* in the Union by a standard of "proof beyond a reasonable doubt."

■ The constitutional privilege against self-incrimination, as a limitation upon government, provides its own inherent evidentiary exclusionary doctrine predicated upon "voluntariness." It reflects a high priority commitment to the principle that excluded as available to government is any person's testimonial self-condemnation of crime unless such person has acted "voluntarily" i. e., unless he has "waived" his constitutional privilege against self-incrimination by choosing, freely and knowingly, to provide criminal self-condemnation by utterances from his own lips.[5]

> Concerning each of the foregoing the Court observed: " . . . without regard to its probative value, evidence is kept from the trier of guilt or innocence for reasons wholly apart from enhancing the reliability of verdicts." (p. 643, 81 S.Ct. p. 1684)

---

4. The Court referred explicitly to the variety of exclusionary rules established under Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) and its "offspring" Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (concerning the voluntariness of confessions) and by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (excluding "confessions flowing from custodial interrogations unless adequate warnings were administered and a waiver was obtained") and under Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961) (making "impermissible the introduction of evidence obtained in violation of a defendant's Fourth Amendment rights.") (367 U.S. p. 643, 81 S.Ct. 1684)

5. The value to which reference is now being made extends significantly beyond the deterrence of police, or prosecution, brutality or lawlessness. There are countless instances in which official conduct in procuring the confession is exemplary, and yet the utterances of the accused, for other reasons, will not be in fact the product of his free will and rational intellect. Indeed, the alleged circumstances of the present case are indicative of this class of situations.

We agree with the observation of Mr. Justice Brennan in his dissent in Lego v. Twomey, supra, that

"given the factual nature of the . . . determination, . . . permitting a lower standard of proof will necessarily result in the *admission of more involuntary confessions* than would be admitted were the prosecution required to meet a higher standard." (404 U.S. p. 493, 92 S.Ct p. 628) (emphasis supplied)

We decide, therefore, that to confirm and preserve the value reflected in the constitutional privilege against self-incrimination we must minimize the risks of allowing legal effectiveness to "non-voluntary", or "involuntary", testimonial self-condemnation even at the expense of producing a loss of evidence which might have probative value; such was the price that our society had chosen to pay when it conferred constitutional protection upon the privilege against self-incrimination.

█ Hence, the presiding Justice, although he is "carefully trained in the law and fortified by judicial experience"—as an extra precaution to ensure that the privilege against self-incrimination is being plenarily implemented,—must apply the strict standard that the prosecution establish the legal admissibility of a confession by "proof beyond a reasonable doubt." The presiding Justice will thereby the better "insulate his mind" from a confession's inherent surface tendency to project a

"near certainty of guilt and make a dispassionate judgment . . ."[6]

concerning operation of the factors— whether they be the special prophylactic requirements of Miranda v. Arizona or the traditional generalized due process "voluntariness"—upon which the evidentiary admissibility of an extra-judicial confession depends.

## II–A

Turning specifically to the substantive question, herein raised, of defendant's subjective mental, emotional or other behavioral weaknesses, as shown by the totality of the evidence, we find the evidence directed primarily to the question of whether defendant should be found not guilty by reason of "insanity."

This Court has cautioned in Thursby v. State, Me., 223 A.2d 61 (1966) of the lack of necessary connection, moving in either direction, between the substantive content embraced under the label "insanity" as directed towards the exoneration of an accused from criminal responsibility and that different substantive embodiment—identified by the same linguistic name, "insanity",—involved in the separate, and independent, question of defendant's competency to stand trial—a type of competency closely analogous to that involved in the present context since in both situations the inquiry is concerned, essentially, with whether defendant is capable, generally, of adequate rational and intellectual activity and, specifically, of waiving legal rights and privileges.

Moreover, as *Thursby* further explains:

"A person. may be mentally competent to stand trial although upon other subjects his mind may be unsound. There are many . . . who, although competent to stand trial, are mentally disturbed or defective and require psychiatric treatment." (223 A.2d p. 68)

The essential point, therefore,—to quote and paraphrase, the full import of the message of *Thursby*—is the following:

"Mental illnesses are of many sorts and have many characteristics. They may

---

6. The quotations are from the concurring opinion of Webber, J., in State v. Merrow, 161 Me. 111, 122, 208 A.2d 659, 664 (1965) as he re-emphasized the rationale underlying the Jackson v. Denno constitutional requirement that a preliminary determination of the "voluntariness" of a confession be made by a tribunal other than the jury which will decide guilt or innocence.

differ widely in their effects on a person's mental processes, his abilities and his behavior." (p. 68)

Hence, to arrive at valid ultimate conclusions, as the outcome of a variety of inquiries in which the law recognizes that mental, emotional or other behavioral infirmities are material factors, we must focus upon the particular impairment involved and the specific relationship it bears to the purpose for which the inquiry is being undertaken. Above all, we must avoid reliance upon any identity of linguistic labels since behind such linguistic identity might be concealed a variety of substantive content; and we must be specially careful to recognize and differentiate the various purposes, functions and policies potentially involved.

In the present situation this approach reveals that the presiding Justice acted without error in allowing defendant's written confession to be admissible, and remain, as evidence.

On review, we have no concern with the record's disclosure of some disagreements between two psychiatrists—Dr. Kiel, who testified on behalf of defendant, and Dr. Saunders, who testified for the State.

The dispute between them—as to whether statements by the defendant that he had come from another planet and, therefore, possessed powers superior to those of earth-originated human beings were genuinely hallucinatory (defendant truly believing them to be reality), as Dr. Kiel testified, or were only play-fantasy (defendant knowing full well that they were not reality but a game of pretense), as Dr. Saunders testified,—presented an issue of credibility to be resolved as the fact-finder saw fit. The evidence provided a substantive basis, even independently of the jury's subjective reactions to the manner in which the doctors gave their testimony, to warrant the jury's crediting of Dr. Saunders rather than Dr. Kiel.[7]

We likewise, in this appellate review, put aside the ultimate conclusory labels attached by Dr. Kiel that defendant was a "schizophrenic paranoid type" or a "pseudopsycopathic schizophrenic" and by Dr. Saunders that defendant was not at all "mentally ill." The meanings attributed by the law to the concepts of "mental disease or defect", insofar as relevant to exonerate from criminal responsibility, are not premised upon a model exclusively medical and, therefore, involve considerations transcending the expertise of the psychiatrist. State v. Hathaway, 161 Me. 255, 262, 211 A.2d 558 (1965) heavily relying upon the analysis in McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962). See also: In re Shackford (also

---

7. Dr. Saunders had responsibility for the defendant while he was under observation and study at the Augusta State Hospital continuously from October 1, 1969 to February 16, 1970. During that period he saw defendant at least four or five days each week with varying degrees of duration and intensity of observation. Dr. Saunders was also in consultation with all the members of the psychiatric staff of the hospital who had performed various tests, physical, psychological and psychiatric, or otherwise, on defendant and who likewise had observed defendant under the varying circumstances.

Dr. Kiel, on the other hand, observed defendant on only a single occasion for a period, maximum, of one and one-half hours. During all of the interview defendant was fully in touch with reality, understood all questions, was coherent in answering them and was "oriented"—in the sense that he knew who he was, where he was, the nature and quality of what was transpiring between Dr. Kiel and himself, that he had been charged with the murder of a man known as Benjamin Flaherty and that he was able to remember correctly and recount the circumstances surrounding the incident, before and after (defendant claiming to have lack of recall only on the single fact concerning whether he had shot Mr. Flaherty). Dr. Kiel accepted the history given him by defendant at face value, including defendant's remarks about his interstellar origins and supernatural powers, without undertaking any independent corroboration of its accuracy.

known as State v. Shackford), Me., 262 A.2d 359, 363–365 (1970).

We concentrate, rather, on the underlying clinical facts concerning defendant's mental, emotional or behavioral make-up or condition.

The evidence reveals as fundamentally uncontroverted that defendant was a person of an average level of human intelligence. For a long while prior to and at the time of his confession, as well as during the subsequent seven months until he was tried and with varying degrees of severity at different times, defendant was withdrawn, apprehensive, nervous, fearful and depressed. He was generally in need of assistance from tranquillizing drugs, sometimes of the so-called "minor" type such as "librium" or "valium" and at other times of the "major" type, such as "thorazine." He had been the product, and suffered from the problems, of a broken home. He had been placed in various institutions for care, including governmental correctional and psychiatric institutions. From his early childhood he had been a difficult person to manage. He was subject to sudden changes of mood and generally resistant to, or defiant of, control by other persons who were exercising proper authority over him—either parents, teachers or persons acting with responsibility to run the private or public institutions in which defendant had been placed.

■ These facts are without sufficient legal impact to preclude, as a justifiable conclusion beyond a reasonable doubt, that defendant was legally competent to waive special constitutional rights and to give a voluntary confession. Especially is this true in light of overwhelming evidence that at all times while defendant was giving his confession—and including all subsequent times to the completion of his trial while defendant had been in contact with doctors and others who had been in a position to observe him—defendant was always fully in touch with reality, acted and spoke rationally and otherwise showed by his conduct that he was fully aware of, and appreciated, the nature and quality of what was involved and at stake in each situation. Furthermore, defendant was competent to stand trial in April of 1970. Neither defendant's attorneys nor any doctors nor the presiding Justice indicated any doubt that at that time defendant understood the nature of the charges against him, was competent to make legal decisions concerning his constitutional rights and was able to assist his attorneys in his own defense. This point has important significance since the evidence clearly establishes that defendant's underlying condition was essentially no different in April of 1970 from what it had been on September 19, 1969 and thereafter.

The evidence, therefore, justifies, as a conclusion beyond a reasonable doubt, that at the time defendant gave his confession in Nova Scotia on September 19, 1969 and subsequently signed it the next day in Maine—and especially since the subjective condition of defendant was shown to have been at that time in all material respects fundamentally the same as it continued to be through into April of 1970 when defendant went to trial—defendant's subjective mental, emotional or other behavioral condition did not prevent him from being legally competent to waive his special constitutional rights under Miranda v. Arizona, supra, or to give a voluntary confession.

The conclusion is reinforced by the additional factors, above shown to have been findings authorized beyond a reasonable doubt, that there were no external circumstances suggestive of inducement, deceit or coercion operative upon defendant.

There was thus no legal error in the determinations of the presiding Justice, or in his ruling, that the confession of the defendant be admitted and, once admitted, should remain in evidence.[8]

8. Since the confession was correctly admitted into, and retained, in evidence, we have no occasion to reach an alternative claim by the defendant predicated on the

## II–B

This decision resolves a potential difficulty brought to light by our own examination of the record.

In his argument to the presiding Justice during the preliminary hearing on the admissibility of the confession, the prosecuting attorney remarked:

> "The State understands the State's burden . . . is that the waiver be shown and that the voluntariness be shown by a preponderance of the evidence. We suggest and submit that that burden has been satisfied."

Immediately thereafter the presiding Justice stated:

> "I have no particular doubt it has been satisfied, so I am going to allow the confession to be admitted."

The true import of this colloquy is unclear. Although there is, perhaps, an intimation that the presiding Justice might have been acquiescing in the prosecutor's contention, a definitive inference to that effect is not justified. It seems the more reasonable interpretation that the presiding Justice was indicating that he was *in fact* convinced beyond all reasonable doubts—as revealed by his comment: "I have no particular doubt . . . ."

The record further reveals that counsel for the defendant had failed to object to the statements of the prosecutor as to the appropriate measure of proof or to request the presiding Justice explicitly to assert the degree of proof upon which his conclusions had been reached—thereby to allow the matter to be clearly settled at that most opportune time.

█ In such circumstances we decide that appellate intervention by us, on our own motion, is not in order. In light of

the reasonable indication that the presiding Justice was in fact satisfied beyond a reasonable doubt, we conclude that it would be a *perfunctory redundancy* were we to remand the case to the presiding Justice to allow him to identify, unequivocally, the measure of the degree of proof actually applied by him in reaching his determinations.

We are fortified in this conclusion since we ourselves have already found that the evidence is fully adequate to authorize conclusions beyond all reasonable doubts of the admissibility of the confession of defendant. Hence, we perceive no danger to defendant of any grave injustice by a declination on our part to initiate, on our own motion, a procedure which, while reflective of a concern for theoretical nicety, would produce no practical difference in the ultimate outcome.

## III

Defendant has made the contention in his brief and in oral argument before this Court, although he had not explicitly designated the issue in his statement of points on appeal, that the jury could not lawfully have concluded that the confession was properly admissible as evidence.

Ordinarily, such contention by defendant would be controllingly settled by our decision upholding the correctness of the presiding Justice's ruling on the admissibility of the confession. Our conclusion that the evidence justifies a determination beyond a reasonable doubt by the presiding Justice that the confession was admissible into evidence would similarly apply to sustain a jury's conclusion of like import.

The present situation, however, presents a complication which requires more extensive analysis. The difficulty is that the presiding Justice submitted the issue of the evidentiary admissibility of the confession

hypothesis that were the confession legally inadmissible as evidence, certain items of real evidence presented at the time and which had been located by use

of the information contained in the confession should likewise be adjudicated legally inadmissible.

for determination by the jury accompanied by an explicit instruction that it was the State's burden to establish admissibility by a "fair preponderance of the evidence." [9]

The questions arise whether this was error at all and, if it was, whether, in the circumstances here involved, it was reversible error.

We find it unnecessary to decide whether the presiding Justice committed error in prescribing "a fair preponderance of the evidence" as the standard for the cogency of proof upon which the jury was to determine the evidentiary admissibility of the confession.[10] The reason is, as we shall now explain in detail, that we hold it inappropriate that the jury have any function to decide the evidentiary admissibility of a confession.

■ Defendant had failed to object at the proper time to the portion of the charge now under consideration, as required by Rule 30 M.R.Crim.P. Defendant, therefore, had failed to meet a condition precedent to his right to assign the matter as error on appeal. Since no violation of 14 M.R.S.A. § 1105 is involved, the claim of error would appear cognizable on appeal only if the error is recognized as "obvious" and "affecting substantial rights" under Rule 52(b) M.R.Crim.P., insofar as it purports to embody the doctrine

of cases such as State v. Smith, 140 Me. 255, 37 A.2d 246 (1944); State v. Peterson, 145 Me. 279, 75 A.2d 368 (1950) and State v. Boisvert, Me., 236 A.2d 419 (1967). Absent here is indication of any such serious prejudice tending to produce manifest injustice.

As developed in the early law of Maine, the requirement that an "involuntary" confession be excluded from evidence reflected a public policy centered, essentially, upon the factor that an "involuntary" confession is unreliable as proof of truth. State v. Grant, 22 Me. 171 (1842); State v. Gilman, 51 Me. 206, 222, 223 (1862).[11]

Since the policy interest originally producing the rule of exclusion was thus intimately related to the probative reliability of the confession, the conclusion followed, readily and reasonably, that the fact-finding process incident to the ascertainment of "voluntariness" (as the criterion of the evidentiary admissibility of the confession) was properly the function of the jury—the jury being the body responsible to adjudge the probative reliability of all of the evidence to establish guilt or innocence.

Accordingly, as the Maine law early developed, the jury was the appropriate organ to decide both the voluntariness (or involuntariness) of a confession, as qualifying it for evidentiary admissibility, as

9. The exact language of the Judge's charge was: "The burden of proof is upon the State to establish by the greater weight of the evidence, or, once again, by the fair preponderance of the evidence, that the warnings of all rights mentioned were given, that they were clearly understood and knowingly given up by the Defendant and that the statement [confession] was voluntary and was freely and willingly made."

10. Prior Maine cases, apparently, have omitted to direct specific attention to the degree of proof required for a jury's determination of the evidentiary admissibility of a confession—except for implications from the general language in State v. Grover, 96 Me. 363, 52 A. 757 (1902), repeated in State v. Priest, 117 Me. 223, 103 A. 359 (1918), that evidence of con-

fessions should be denied admissibility as evidence "when there . . . [is] any reasonable doubt of their being voluntary." *Grover* 96 Me. at p. 364, 52 A. at p. 758; and *Priest* 117 Me. at p. 228, 103 A. at p. 362.

11. It is interesting to note that State v. Gilman contains a suggestion of a further policy, later recognized by the Supreme Court of the United States as the basis for establishing a constitutional imperative excluding involuntary confessions on "due process" grounds—that, in addition to a concern for reliability in the adjudication of the truth, there is a need to exclude "involuntary" confessions to ensure the meaningful operativeness of the constitutional protection against self-incrimination. (See pp. 215, 216 and 223)

well as the weight or credit to be assigned to it, as part of the totality of the evidence tending to prove guilt or innocence.

A role for the presiding Justice, to be empowered to exclude an "involuntary" confession, was then thought relatively unimportant. Subsequently, as the law of Maine ultimately authorized the presiding Justice thus to intervene, the practice arose not because the policy factors excluding involuntary confessions as evidence were thought to require it in principle but rather "out of tenderness for the respondent"— since in those earlier days "the respondent could not have counsel and could not testify in his own behalf." State v. Grover, 96 Me. 363, 364, 52 A. 757, 758 (1902).

Indeed, State v. Grover intimates, as of 1902, that probably there was little reason to have the presiding Justice continue to function with authority to rule upon the evidentiary admissibility of a confession, since respondent by that time was

> "allowed counsel, and . . . also allowed to testify in explanation of his acts and statements, . . ." (p. 364, 52 A. p. 758)

and, therefore,

> "more may be left to the jury as to the probative force of such confessions." (p. 364, 52 A. p. 758)

Although thus perceiving something of an anomaly, or at least a redundancy, in a two-step procedure by which both the presiding Justice and the jury make independent determinations of the evidentiary admissibility of the confession,[12] State v. Grover recognized the practice (apparently borrowed from Massachusetts) that the presiding Justice make preliminary determinations of the "voluntariness" of the confession; and if he excludes the confession, his ruling is controlling but if he admits it into evidence, defendant is authorized (1) to

> "require the presiding justice to instruct the jury it should not give credit to the confession if [it was] thus improperly obtained" (p. 366, 52 A. p. 759)

and (2) to

> "appeal to the jury to exclude it from consideration as improperly obtained, and can show all the circumstances tending to destroy or weaken its probative power." (p. 366, 52 A. p. 759)

This has been the practice which has continued in Maine since State v. Grover, supra, and as recognized in later cases such as State v. Priest, 117 Me. 223, 103 A. 359 (1918); State v. O'Donnell, 131 Me. 294, 161 A. 802 (1932); State v. Robbins, 135 Me. 121, 190 A. 630 (1937). The procedure was carried over, in State v. Merrow, 161 Me. 111, 208 A.2d 659 (1965), to issues relating to "consent" to a blood test, as involved in prosecutions for operation of a motor vehicle under the influence of intoxicating liquor, since it was thought that the factual determinations are "analogous" to those incident to the adjudication of the "voluntariness" of a confession.

Subsequent references to the procedure, or some of its aspects are found, *inter alia,* in State v. Warner, Me., 237 A.2d 150 (1967); Duguay v. State, Me., 240 A.2d 738 (1968) and State v. Smith, Me., 277 A. 2d 481 (1971).

Although the earlier Maine cases had seemed to emphasize the role of the jury as primary and that of the presiding Justice as secondary, the decision of the Supreme Court of the United States in Jackson v. Denno,—resting upon an evaluation of the respective roles of judge and jury as affected by the constitutional factors which have entered more recently and have essentially superseded the prior common law policies—definitively reversed the order of primacy and raised serious doubts that

12. The "New York" rule so-called as it operated prior to being held unconstitutional in Jackson v. Denno, supra, did eliminate the presiding Justice as a fact-finder with responsibility to make independent determinations of the "voluntariness" of the confession.

the jury is properly involved at all in the determination of the evidentiary admissibility of a confession.

Jackson v. Denno, it is true, fails to require, as a federal constitutional imperative, that there be withheld from the jury which is deciding guilt or innocence the function to determine the evidentiary admissibility of a confession. Yet, the actual decision in Jackson v. Denno,—that there is constitutionally requisite an independent determination of the evidentiary admissibility of a confession by a tribunal other than the jury which is to adjudicate guilt or innocence—derives from reasoning which strongly undermines the policy wisdom of allowing such jury to determine the evidentiary admissibility of a confession.

Jackson v. Denno, stresses the following weaknesses and dangers. First, the jury which is to adjudicate guilt or innocence

". . . is at once given both the evidence going to voluntariness and all of the corroborating evidence showing that the confession is true and that the defendant committed the crime. The jury may therefore believe the confession and believe that the defendant has committed the very act with which he is charged, a circumstance which may seriously distort judgment of the credibility of the accused and assessment of the testimony concerning the critical facts surrounding his confession." (378 U.S. p. 381, 84 S. Ct. p. 1783)

Second,

"(t)he jury, . . ., may find it difficult to understand the policy forbidding reliance upon a coerced, but true, confession, . . .." (p. 382, 84 S.Ct. p. 1783)

Third,

"(t)hat a trustworthy confession must also be voluntary if it is to be used at all, generates natural and potent pressure to find it voluntary. Otherwise the

guilty defendant goes free." (p. 382, 84 S.Ct. p. 1783)

In the decision by this Court in the case of State v. Merrow, supra, the concurring opinion of Webber, J., reveals that the Court had perceived this most significant message of Jackson v. Denno. Justice Webber's analysis stresses that it is precisely the unsound and prejudiced manner in which the jury which decides guilt or innocence will approach arid determine the evidentiary admissibility of a confession which necessitates, constitutionally, the interposition of the presiding Justice to make independent determinations of the issue. See: State v. Merrow, supra, 161 Me. at p. 121 and p. 122, 208 A.2d 659.

Although in State v. Merrow this Court might be said to have indirectly reaffirmed, recently, the procedure by which the evidentiary admissibility of a confession (once the confession is admitted into evidence by the presiding Justice) is again independently reviewed by the jury, it must be stressed that the actual decision in *Merrow* concerned the role of the presiding Justice and, specifically, his failure to make an independent determination of the voluntariness of the "consent." Any discussion of the role of the jury would, therefore, have been in the nature of dictum.

In the case at bar, however, since we are called upon to decide whether the presiding Justice's charge to the jury, in relation to the jury's function to evaluate the evidentiary admissibility of the confession, constitutes error which affects substantial rights or has caused manifest injustice to the defendant, the role of the jury in determining the evidentiary admissibility of a confession is squarely at issue.

Since (1) the jury adjudicating guilt or innocence is highly likely to be inefficient and prejudiced in determining the evidentiary admissibility of a confession, insofar as its admissibility depends on factors mostly unrelated to the reliability of the

evidence as a source of truth,[13] and (2) it has become constitutionally requisite since Jackson v. Denno, that, in any event, another tribunal better equipped for the job must do it and (3) in the prior aspects of this decision we have already decided that the presiding Justice is scrupulously to ferret out and exclude any confession the voluntariness of which is reasonably doubted, we believe that it is clearly unsound in principle, creates serious practical dangers and is unnecessary to give adequate protection to the defendant that the "guilt-adjudication" jury become involved to provide a second forum for determination of the question of the evidentiary admissibility of a confession.[14]

Additionally, the recent decision of the Supreme Court of the United States in Lego v. Twomey, supra,—that the federal Constitution contains no imperative that all States must submit the issue of the evidentiary admissibility of a confession to the jury responsible to adjudicate guilt or innocence—provides cogent support for a

13. As we have mentioned previously, the common law rule by which an "involuntary" confession was to be excluded from evidence was seemingly predicated on the pre-supposition that the "involuntariness" of the confession rendered it unreliable as a source of truth. Similarly in Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953), the development of the federal due process constitutional rationale for exclusion, essentially superseding common law principles, was regarded as likewise predicated on the premise that exclusion is required because an "involuntary" confession is inherently untrustworthy.

Such constitutional approach was ultimately and definitively repudiated, however, in Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); as reaffirmed in Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Jackson v. Denno, supra, and Lego v. Twomey, supra. It is now indisputably established that the constitutional foundations for the evidentiary exclusion of involuntary confessions reflect policy values, additional to, and basically independent of, considerations of probative reliability. These independent values are (1) the safeguarding of the right of an individual "entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances" (Lego v. Twomey, 404 U.S. at p. 485, 92 S.Ct. at p. 625) and (2) to assist in "deterring lawless conduct by police and prosecution." (Lego v. Twomey at p. 489, 92 S.Ct. at p. 626.)

14. After the decision in Jackson v. Denno at least three jurisdictions, previously following the "New York" rule nullified by Jackson v. Denno, explicitly repudiated as incongruous the practice that the jury decide the evidentiary admissibility of a confession in addition to the presiding Justice; they made the ruling of the presiding Justice exclusively controlling. Michigan: People v. Walker, 374 Mich. 331, 132 N.W.2d 87 (1965); Wisconsin: State v. Burke, 27 Wis.2d 244, 133 N.W. 2d 753 (1965); and Minnesota: State v. Keiser, 274 Minn. 265, 143 N.W.2d 75 (1966).

By statute, enacted after Jackson v. Denno, California in 1965 repudiated its prior rule allowing a further determination of evidentiary admissibility by the jury as a second-guessing of the presiding Justice's determination of admissibility and made the judge's ruling exclusively controlling. (Cal.Evid.Code, § 405)

New York itself, after Jackson v. Denno, continued to allow the jury to remain in the picture to determine the evidentiary admissibility of a confession, changing its procedure only to conform to Jackson v. Denno by inserting a preliminary ruling by the presiding Justice. A strong factor in this approach in New York was the belief that provisions of the New York State Constitution necessitated retention of a jury determination of the issue of voluntariness—even as it bears upon the evidentiary admissibility of a confession in contradistinction to evaluation of its credibility or weight. People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

Similarly, the Oregon Court, when, to fulfill the mandate of Jackson v. Denno, it added the requirement of a prior determination by the presiding Justice of the admissibility of a confession seemed to believe that preservation of the right of trial by jury, within the meaning of the Oregon State Constitution, obliged it to retain the jury's function to decide the evidentiary admissibility of a confession as well as its credibility and weight. State v. Brewton, 238 Or. 590, 395 P.2d 874 (1964).

policy determination which withholds such function from the jury and places it exclusively in the hands of the presiding Justice. To paraphrase Lego v. Twomey we are not disposed, in the announcement of a sound public policy for the State of Maine, to authorize, or require, a jury to function in a manner which is highly likely to be unreliable and prejudicial,

> "merely to afford . . . [defendant] a second forum for litigating his claim" (Lego v. Twomey, 404 U.S. at p. 490, 92 S.Ct. at p. 627)

—when the constitutional guarantee of trial by jury does not mandate a

> "change [of] the normal rule that the admissibility of evidence is a question for the court rather than the jury" (Lego v. Twomey at p. 490, 92 S.Ct. at p. 627)

and does not require

> "that both judge and jury pass upon the admissibility of evidence when constitutional grounds are asserted for excluding it." (Lego v. Twomey at p. 490, 92 S.Ct. at p. 627)

We are satisfied that advance notice of all of the aspects of a sound public policy for the State of Maine had been indicated both by Jackson v. Denno, supra, and the concurring opinion of Justice Webber in State v. Merrow, supra, sufficiently to have provided a meaningful alert that the prevailing practice in Maine was in jeopardy; and that were the issue of submitting to the jury the issue of the evidentiary admissibility of a confession to be squarely presented for decision, the practice would be disapproved. Hence, decision in the case at bar that submission of the issue of the evidentiary admissibility of a confession to the jury is neither authorized nor required should come as no unreasonable surprise.

Had the presiding Justice in the case at bar elected deliberately to precipitate the issue for our decision, by a ruling—made upon the basis of the rationale underlying Jackson v. Denno and the special and explicit expositions of it in the concurring opinion of Justice Webber in State v. Merrow—that he would deny to the jury the function of determining the evidentiary admissibility of the confession once he, the presiding Justice, had held it admissible, and had defendant raised the issue for appeal by specific and timely objection, we should have sustained such ruling by the presiding Justice. A fortiori, we have no hesitancy in deciding in the present appeal that, by submitting to the jury the issue of the evidentiary admissibility of the confession, accompanied by an instruction that the jury should make the determination on the basis of proof by a fair preponderance of the evidence, the presiding Justice had given the defendant more than the sound public policy of this State warrants that he be afforded. For this reason, the procedure itself, or error (if any) in the charge as a subsidiary incident of the over-all procedure, will not be held obvious error, or error affecting substantial rights. It is not error, if error at all,

> "so highly prejudicial and calculated to result in injustice that an unjust verdict would inevitably result or . . . that the accused has not had the impartial trial to which under the law he is entitled." State v. Rowe, Me., 238 A.2d 217, 225 (1968)

We add a further clarification. We have here evaluated the procedure pertaining to the evidentiary admissibility of confessions in a context, essentially, of manifest error and substantial injustice. It is the full purport, and import, of the present decision, however, to delineate a generalized statement of the correct legal principles now to be followed in the determination of issues relating to the admissibility of a confession as evidence.

We have decided that it is the law of Maine that the "orthodox" rule shall govern rather than the "Massachusetts rule" (to use the shorthand designation by which the

differences have been indicated in the literature and as described in *Jackson v. Denno*.)

◼ Thus, the law of Maine is that the presiding Justice must conduct an independent evidentiary hearing (in the absence of the jury) pertaining to all of the factors upon which the evidentiary admissibility of the confession is legally dependent—whether it be in terms of the special prophylactic constitutional requirements of *Miranda v. Arizona* or of the traditional due process "voluntariness" of the confession, or both. The presiding Justice shall make his determinations and ruling as to admissibility governed by the principle that the prosecution must prove beyond all reasonable doubts the factors qualifying the confession to be admissible as evidence (as previously decided herein). The ruling of the presiding Justice will thereupon settle the question of the evidentiary admissibility (or inadmissibility) of the confession for all purposes concerned with the further conduct of the trial. Specifically, should the presiding Justice rule that the confession is admissible into evidence, the jury is to have no function to perform regarding the legal admissibility of the confession; the jury's considerations of the confession will be solely for the purpose of allowing the jury to evaluate the totality of the circumstances in which the confession was given for the purpose of assigning credibility and weight to it, in the light of all of the evidence and as part of the jury's function to make the ultimate determination of guilt or innocence.

To the extent that any of our prior cases, insofar as they might have spoken concerning the evidentiary admissibility of confessions, have contained express statements, or intimations, authorizing or requiring that the jury pass upon the evidentiary admissibility of the confession—including specifically, the cases, *inter alia,* of *Grover, Priest, O'Donnell, Robbins, Merrow, Duguay, Warner* and *Smith,* all *supra,* they are held to be without continuing force, as precedent, to indicate the law of this State.[15]

IV

Defendant maintains that the felony-murder instruction to the jury was erroneous.

He says, first, that the giving of a felony-murder instruction is error when the particular felony involved fails to project homicide as a natural and probable consequence.

◼ It is unnecessary to evaluate whether the felony-murder principle in Maine has been, or should be, thus limited.

---

15. Nothing in the present decision, however, is calculated to impair the precedental effect of the recent decision of this Court in State v. Chaplin, Me., 286 A.2d 325 (1972) delineating the practice to be followed in relation to deetrminations of the admissibility of "dying declarations" as an exception to the general rule by which hearsay evidence is excluded.

As the Court stressed in *Chaplin,* neither the constitutional facets nor the general public policy considerations so important in the determinations of the evidentiary admissibility of confessions are significantly involved in the evaluation of the evidentiary admissibility of dying declarations. Specifically, (1) the dying declaration lacks the overwhelming potency to validate itself as a reliable statement of the truth (so characteristic of a confession) and, therefore, the jury may be regarded as fully competent to avoid being confused or unduly influenced by the content of the dying declaration and able to make a dispassionate evaluation of the factors upon which the admissibility of the dying declaration is dependent; and (2) in any event, the primary policy basis upon which dying declarations are allowed into evidence, rather than excluded under the general hearsay rule, and the criteria of admissibility generated by such policy, are directly and intimately concerned precisely, and fundamentally, with the reliability of the content of the declaration as a source of truth; and, therefore, it is not incongruous that the jury, as the ultimate arbiter of the reliability of the evidence, should be concerned with evidentiary admissibility when the criterion of admissibility is constituted, essentially, only by probative reliability.

The felony here of concern embraces the breaking and entering of a dwelling house in the day time. It is thus a type of crime which, like assault or robbery, has strong potential to result in a homicide. Even on defendant's hypothesis, therefore, a "felony-murder" instruction was appropriate. The evidence was sufficient to warrant a jury conclusion beyond a reasonable doubt that the potential for homicide had here become an actuality. The owner of the house had returned, after having been away, and while he was in the process of seeking to enter the house, he surprised the defendant who was still unlawfully inside the house after he had broken and entered. No doubt to avoid being detected and apprehended for his unlawful conduct, the jury might reasonably conclude, defendant thereupon shot and killed the owner of the house.

Defendant next claims that the felony-murder rule is incorrectly invoked when, as here, the proof of the manner in which defendant killed the other human being itself suffices to render the homicide punishable as murder without resort to the independent factor that it occurred, during and because of, the commission of a felony.

Defendant takes nothing from this point. It has been rejected, and foreclosed against defendant's position, in our recent decision in State v. Trott, Me., 289 A.2d 414 (1972).

Defendant's last assertion of error is that the judgment of conviction should be reversed because the jury's failure to find defendant not guilty by reason of "insanity" was a conclusion "against the weight of the evidence."

 In this State such a contention, on appeal, or on a motion for a new trial, presents the same issue as is raised by a motion, in a criminal case, for judgment of acquittal. See: Glassman, Maine Practice, Criminal Rules §§ 29.3, 33.4. The question is whether on all the evidence a conclusion that defendant is, beyond all reasonable doubts, guilty would be rational.

 In Maine exculpation from criminal responsibility by reason of insanity is an affirmative defense upon which defendant bears the ultimate burden of proof by a fair preponderance of the evidence.

Our prior review of the evidence may be carried over with applicability to the present context insofar as it discloses, essentially as undisputed, defendant's actual mental, emotional and other behavioral condition. It reveals that a fact-finder would be warranted in concluding, beyond all reasonable doubts (were that necessary) that, pursuant to the standard by which "insanity" can exonerate from criminal responsibility,—and as delineated in State v. Hathaway, supra,—at the time of the commission of the offense here charged, the mental, emotional and other behavioral processes of the defendant had not been substantially affected and his behavioral controls had not been substantially impaired such that defendant should be excused from criminal responsibility.

Clearly, then, the evidence was adequate to authorize as a rational conclusion by the jury that defendant had failed to meet an ultimate burden of proof reposing upon him to establish by a fair preponderance of the evidence that he should be exonerated from responsibility subjecting him to punishment as a criminal.

The entry is:

Appeal denied.

All Justices concurring.