**STATE of Maine**

v.

**Frederick W. BROWN.**

Supreme Judicial Court of Maine.

March 22, 1973.

Joseph E. Brennan, County Atty., Portland, William P. Dubord, Law Student, for plaintiff.

Caroline Glassman, Portland, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE and WERNICK, JJ.

WEATHERBEE, Justice.

The Defendant was adjudged guilty of the offense of assault and battery of a high and aggravated nature (17 M.R.S.A. § 201) after conviction by a jury in Cumberland County. His appeal presents several issues, only one of which requires our examination since it proves dispositive.

There was very little dispute as to the facts of the incident. The jury could have found from the evidence most favorable to the State that the strange drama developed in this manner:

About 11:30—11:45 P.M. on April 10, 1969 a Mr. Wolstenhulme accompanied by a companion, a Mr. Nye, was driving from Portland toward Mr. Wolstenhulme's home on route 302 in South Windham. He had attended to some business in Portland and then had visited a tavern where he had had "a couple of glasses of beer." Mr. Wolstenhulme's attention was drawn to a station wagon which followed close to the Wolstenhulme rear bumper for a considerable distance. He pulled his car over to the right and as the station wagon passed him, he thought he recognized the driver as Mr. Frederick W. Brown, Sr., the father of the Defendant.[1]

Mr. Wolstenhulme followed this station wagon past his own home, continuing to follow it as it turned off on the Pope road, and then, 100 to 150 yards farther on, into the Brown driveway. He drove his car up behind and within a foot or two of the rear bumper of the station wagon. Both he

and Mr. Nye got out immediately. The night was dark but there was an outside light on or near the Brown residence.

Mr. Wolstenhulme testified that his purpose was just to "stop and see" Mr. Brown, Sr. He walked up to within 6 to 10 feet of the driver of the station wagon who was just getting out of his vehicle and said "Do you always drive like that?"[2]

The driver of the station wagon was the Defendant, the 28 year old son of the elder Brown, and he was giving his 17 year old brother a ride home from Portland. The Defendant and Mr. Wolstenhulme recognized each other then although they were not well acquainted. As Mr. Wolstenhulme approached, the Defendant backed away and told Mr. Wolstenhulme that he had a gun and would shoot him if he didn't leave. The Defendant was armed with a .22 calibre semi-automatic pistol loaded with 10 cartridges. Mr. Wolstenhulme saw the gun but said "Go ahead and shoot me", raising his hands and continuing to advance as Defendant retreated before him. The Defendant fired a warning shot directly into the ground. Mr. Wolstenhulme advanced still further toward the Defendant and the Defendant, while continually backing up, then fired four more shots, two of which struck Mr. Wolstenhulme in one thigh and another hit him in the other thigh. Mr. Nye also had moved toward the Defendant from the passenger side of the Wolstenhulme car and the Defendant then told Nye to get back in the car or he would shoot Nye, too.[3]

1. The Defendant and his 17 year old brother testified that as they came upon Mr. Wolstenhulme's car it was traveling very slowly and erratically swerving from one side of the road to the other so that the Defendant was forced to follow behind it a considerable distance before he was able to pass and, that after the Defendant passed, this car increased its speed and followed the Defendant about two miles and into the Brown driveway.

2. The Defendant and his brother testified that Mr. Wolstenhulme said, angrily, "Do

you always drive like that, you son of a bitch?"

3. The Defendant's version as to this differed very little from that presented by the State: The Defendant said he was loaning the pistol to his younger brother whom he was driving home from Portland. When Mr. Wolstenhulme approached him belligerently he believed himself in serious danger of physical assault. Mr. Wolstenhulme had an object in his hand which appeared to be a tire iron. The Defendant had the unloaded pistol in his hand

Mr. Wolstenhulme said at the time he was shot he had advanced toward the retreating Defendant from the driver's door of his own car, to the front of his own car, to the station wagon and then the length of the station wagon to its left front fender. The Defendant had retreated from the driver's door of the station wagon to its front and then around the front to the right front fender.

At this point Mrs. Brown, the Defendant's mother, opened a second story window and shouted to Mr. Wolstenhulme and Mr. Nye to leave the Brown property. Mr. Wolstenhulme said "Let's go, Bob" and they got in Mr. Wolstenhulme's car and drove away. When the last shot was fired Mr. Wolstenhulme had felt warmth on his leg but did not realize until he got into the car that he had been shot. The warmth came from blood from six wounds—three of entrance and three of exit.

Mr. Wolstenhulme was 36 years old, 5′ 8″ tall and weighed 194 pounds. The Defendant was 28 years old, 5′ 8″ tall and weighed 225 pounds.

*The Justice's Instructions*

Defendant's trial counsel noted no objections to the instructions which the Pre-siding Justice gave to the jury and made no request for further instructions. The Defendant's Statement of Points on Appeal included:

"The Presiding Justice erred in his charge to the jury with regard to the Defendant's right to repel an attacking trespasser."

■ As the Defendant failed to meet this condition precedent to his right to assign complaints concerning the Justice's charge as error on appeal,[4] our examination of the record will be confined to a determination of whether the Justice's instruction contained seriously prejudicial errors tending to produce manifest injustice. State v. McKeough, Me., 300 A.2d 755 (Opinion, February 28, 1973); State v. Collins, Me., 297 A.2d 620, 631 (1972).

■ Whether particular language used by a Justice in instructing a jury can be considered to be seriously prejudicial error tending to produce manifest injustice may depend upon its effect when viewed with the charge as a whole and upon the particular state of the evidence presented concerning the issue involved. State v. McKeough, supra.

and the clip containing 10 cartridges was in his suit pocket as he intended to take them into the house. As Defendant backed away from Mr. Wolstenhulme he inserted the clip into the pistol and jacked a cartridge into the chamber. He warned Mr. Wolstenhulme to stay away from him or he would shoot. He fired a warning shot into the ground. Mr. Wolstenhulme kept advancing and the Defendant retreated until he had backed all the way around to the right side of his car. At no time did Mr. Wolstenhulme raise his hands as he claimed. Mr. Wolstenhulme was following him "fast". As Mr. Wolstenhulme kept advancing upon him the Defendant fired four more shots while backing away. Mr. Wolstenhulme had followed Defendant around the car until he was opposite the center of the hood and only three feet from the Defendant when either the Defendant's bullets or Mrs. Brown's shouts caused him to stop. During this time Mr. Wolstenhulme's friend had started to approach Defendant from the other side. The Defendant said that he didn't realize that he had hit Mr. Wolstenhulme who said "Let's go, Bob." Defendant then turned to Mr. Nye and said "You get back in your car" and Mr. Nye hesitated a moment and then got back into the car.

4. M.R.Crim.P., Rule 30(b):
"...No party shall assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. ..."

The Justice's charge—with the exception of the passage we are about to discuss—was a correct and scholarly explanation of the elements of the crime of assault of a high and aggravated nature, of the theory of self defense and of the limitations on the right to eject trespassers.

The Justice concluded his instruction by advising the jury to take "these generalities and relate them to the facts at hand". He then said:

"Let us assume, for example, and I don't wish to have you draw any inferences from the facts that I am making some assumptions. I am just giving them to you to help you in your thinking as to applicability of the law to the situation at hand. Let us assume that this State's witness entered these premises, asked.a question *with nothing in his hands*, with his hands in the air, even though the question was insulting in nature, or even though the entry was that of a trespasser, was peaceably made. Assume those things, under such circumstances one would not have the right to use firearms to eject such a person from the premises. Let us assume again that such a person entered upon the premises *and did have some unidentified object in his hands*. And let us assume that he then advanced upon the defendant who had a loaded revolver in his hand, a loaded pistol. Let us then assume that you find from the facts, as they are thus posed, that it was in the mind of the defendant necessary to fire that pistol to defend himself, *against what he felt to be a threatened assault upon his person*. In such an event, if that is your conclusion, then this defendant could not be said to have committed an unlawful assault. . . ." (Emphasis added.)

It will be remembered that the only serious dispute between Mr. Wolstenhulme's testimony and the Defendant's was that Defendant insisted that as Mr. Wolstenhulme approached him Mr. Wolstenhulme had an object in his hand which appeared to be a tire iron while Mr. Wolstenhulme said he had nothing in his hand. The Justice's closing language pointed up this conflict of testimony when he asked the jury to assume two fact situations—one in which the theoretical trespasser entered the premises "with nothing in his hands" and the other in which the trespasser entered with "some unidentified object in his hands". Using these fact situations the Justice attempted to explain to the jury the amount of force that the Defendant could justifiably use to repel the invader.

We are convinced that this unintentional emphasis upon the distinction between whether Mr. Wolstenhulme did or did not have something in his hands as he approached the Defendant tended to suggest that the resolution of this disputed issue should be determinative of the charge against Defendant. We feel that it may well have prevented jury consideration of one alternative favorable to the Defendant, to wit: that even if the jury found that Defendant *knew* he was being threatened with an assault by a man *without* weapons the jury still might find that the force Defendant used to repel the threatened attack was reasonable under the circumstances.

The unusual facts of the case magnify the danger of unintended injustice in the language used. The manner in which the two men approached the Defendant, at midnight, in a rural area, must have appeared threatening. The Defendant retreated, warning that he would shoot to defend himself and fired one warning shot into the ground. Mr. Wolstenhulme continued advancing on the retreating Defendant in spite of the warning words, in spite of the warning shot, even continuing to approach Defendant after he had been shot.

█ We realize that the jury may have believed every word spoken by the State's witnesses and may have rejected every word spoken by the Defendant, his brother and mother, including the Defend-

ant's assertion that he believed himself in danger of being attacked. While we must not attempt to substitute our judgment as to credibility for that of the jury (Manchester v. Dugan, Me., 247 A.2d 827, 829 (1968)) we find inescapable the conclusion that the Justice's well intentioned use of the examples of the trespasser with a weapon and the trespasser without a weapon may well have misled the jury into believing that the degree of force that could be used in repelling an attack depended upon whether the trespasser had a weapon. On these facts, we believe the use of the examples reached the status of serious prejudicial error which tended to produce manifest injustice.

The entry must be:

Appeal sustained.

New trial ordered.

POMEROY and ARCHIBALD, JJ., did not sit.

All Justices concurring.