STATE of Maine

v.

Alphonse P. BLOUIN, Jr.

Supreme Judicial Court of Maine.

April 21, 1978.

Joseph M. Jabar, Dist. Atty., Paul D. Mathews (orally), Asst. Dist. Atty., Augusta, for plaintiff.

Daniel G. Lilley, Thomas F. Shorthill (orally), Portland, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

On July 26, 1976, defendant Alphonse P. Blouin, Jr. was charged in separate indictments in the Superior Court (Kennebec County) with the offenses of arson (17–A M.R.S.A. § 802) and burglary (17–A M.R.S.A. § 401). In a consolidated trial held in November 1976 a jury found defendant guilty as charged in each indictment.

Defendant has appealed from each of the judgments of conviction. We deny each appeal.

Late in the afternoon of July 10, Jane Elliott, who was staying at a cottage on Belle Island at Cobbosseecontee Lake in Winthrop, Maine, observed a blue and white boat (later ascertained to belong to defendant) cruising toward an old, two story, wooden frame summer cottage, owned by F. W. Elliott Farr, situated at the end of Belle Island. About twenty minutes later, she heard the loud voices of several people, again observed the same boat at the end of the island and also noticed yellow smoke coming out of the Farr cottage. Jane El-

liott then ran toward the cottage. As she was approaching the cottage she came close enough to the blue and white boat to observe that defendant was in the boat with several other persons. At this time there was a roaring fire at the Farr cottage. Jane Elliott heard defendant yell to the people on the island that they "had better call the fire department", and believing that defendant or his companions were responsible for the fire, she called out to the others on the island to get the number of defendant's boat. Immediately, defendant lowered the motor of the boat and sped off across the lake.

After the cottage was consumed by the fire, the fire marshall who was investigating the fire determined that the fire had been intentionally set with the use of a flammable liquid.

Defendant was arrested the next day and had a conversation with Chief Bonney of the Winthrop Police Department. In the conversation defendant gave information which led to the arrest of Darlene Gilpatrick and Raymond Libby.

Darlene Gilpatrick testified at the trial as follows. She had met defendant for the first time on the morning of the fire on Belle Island. Later that day, defendant took her and Raymond Libby to Cobbosseecontee Lake, and they cruised around the lake in defendant's boat. After defendant stopped the boat at Belle Island to explore what he claimed was a "haunted" cottage, defendant and Libby removed a screen from a window of the Farr cottage and entered it. They then made several trips back and forth from the cottage to their boat, carrying kerosene lamps found in the cottage. Finally, defendant and Libby came out of the cottage together and boarded the boat with Darlene Gilpatrick. Libby was angry with defendant and said to him in a loud voice: "that was a dumb . . . thing to do." Defendant responded: "that way they wouldn't be able to find any fingerprints." Shortly thereafter, defendant stated that he wanted "to get out of there." As the boat started to leave the

island, Darlene Gilpatrick noticed that the building was on fire. When she told defendant and Libby that "it was crazy", defendant just stated "that the ghosts would have to find a new home to live in." After the boat had proceeded part way across the lake, defendant turned it to go back to Belle Island to call the Fire Department, thereby to make it appear that the persons in the boat had nothing to do with the fire. When they approached Belle Island again, the fire was roaring and the entire Farr cottage was engulfed in flames. Several people had gathered around the cottage and defendant yelled to them to call the fire department. When a girl who was standing on the shore pointed at defendant's boat and called out to her companions to get the number of the boat, defendant again caused the boat to speed off across the lake.[1] Libby later threw the lanterns overboard, and when defendant docked his boat, he instructed Libby and Gilpatrick to act as if nothing had happened.

### 1.

■ Defendant's first contention on appeal is that the presiding Justice erred in failing to exclude the testimony of Darlene Gilpatrick and the testimony of Chief Bonney concerning his conversation with defendant. Defendant claims that his statements to Chief Bonney, tending to implicate defendant in the burglary and identifying Darlene Gilpatrick as a participant, were obtained in violation of the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and were given involuntarily because induced by an improper promise to defendant of leniency.

These contentions fail.

The presiding Justice held a "voluntariness" hearing in the absence of the jury. At this hearing Chief Bonney and Trooper Walter Williams testified that on July 11, 1976 they had arrested defendant on the Sanborn Road in East Monmouth. At that time, when Williams started to read to defendant a statement of the *Miranda* rights,

---

1. Gilpatrick's testimony thus partially corroborated Jane Elliott's testimony.

defendant said that he knew his rights and did not want to talk to the police since he had already called his attorney. The officers asked no questions and took defendant to the Winthrop Police Department. At the station Chief Bonney began to read the *Miranda* warnings. Defendant told him that Williams "had already done that." Chief Bonney completed the *Miranda* warnings but refrained from asking questions. About fifteen minutes later, however, defendant asked to speak to Chief Bonney in private, and defendant then provided the information implicating him in the burglary and leading to the apprehension of Gilpatrick and Libby. Defendant testified that Chief Bonney had promised that if defendant would "play ball", defendant would not have to go to court. Chief Bonney and Trooper Williams both denied having made any promises to defendant.

After the voluntariness hearing, the presiding Justice ruled:

> "[T]he State has established beyond a reasonable doubt that the defendant was given proper *Miranda* warnings, and that after the warnings were given he knowingly and willingly made a statement to the officer. The statement is determined by this Court to be a voluntary statement, and I so rule."

We conclude that the presiding Justice was warranted in finding beyond a reasonable doubt that the arresting officers had complied with the requirements of *Miranda v. Arizona,* supra, and that defendant's statements were knowingly and voluntarily made.

■ The brief lapse of time after the warnings by Williams and Chief Bonney did not per se render these prior *Miranda* warnings ineffective or require repetition of them. *State v. Peterson,* Me., 366 A.2d 525 (1976); *State v. Myers,* Me., 345 A.2d 500

(1975). Defendant indicated by his own statements that he was familiar with his legal rights and had already talked to his attorney.

■ The related issue of whether defendant's decision to speak to Chief Bonney was improperly influenced by a promise of leniency involved questions of fact which were for the presiding Justice to resolve. See *State v. Tardiff,* Me., 374 A.2d 598, 600–601 (1977); *State v. Collins,* Me., 297 A.2d 620, 625 (1972). The Justice was justified in believing the testimony of Chief Bonney and Trooper Williams that no promises were made and that defendant voluntarily initiated the conversation with Chief Bonney.[2]

### 2.

■ Defendant's second claim on appeal is that the Court committed error by allowing inadmissible testimony in evidence. The contention relates to Darlene Gilpatrick's testimony that as the defendant and Raymond Libby left Belle Island, Libby angrily yelled at defendant that "that was a dumb . . . thing to do", and defendant replied: "Well, that way they wouldn't be able to find any fingerprints."[3] Defendant contends that this evidence was inadmissible because either (1) the statements were hearsay, Rules 801–802, M.R.Evid., or (2) the probative value of the statements was substantially outweighed by the danger of unfair prejudice. Rule 403, M.R.Evid.

■ The statements of Libby and Gilpatrick to defendant and defendant replies constituted a total context showing admissions by defendant which, under Rule 801(d)(2)(A) and (B), M.R.Evid., are not hearsay. As made in response to remarks of Libby and Gilpatrick defendant's statements about eliminating fingerprints and

---

2. Although the presiding Justice did not make a specific finding in regard to the alleged promise of leniency, no such specific finding was requested by defendant. Since the ultimate inquiry concerns the voluntary nature of the confession or admission, we interpret the Justice's finding that defendant's statements were voluntary as an implicit finding that the presiding

Justice did not credit defendant's testimony that Chief Bonney had made an improper promise of leniency.

3. Defendant also attacks the admissibility of his further statement that "the ghosts would have to find a new home to live in."

the ghosts finding a new home indicated that defendant agreed with the implication of the remarks by Libby and Gilpatrick that defendant had set fire to the cottage, and thus were admissions by defendant.[4]

We reject defendant's contention that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. As admissions by defendant, the evidence would tend to influence the jury against defendant, but this is prejudice to defendant on a proper, not an improper, basis; it is not *unfair* prejudice to defendant. See *State v. Hurd,* Me., 360 A.2d 525 (1976).

### 3.

As a last point of appeal, defendant contends that the Court erred in denying his motion for judgment of acquittal on the arson charge because defendant's son (Alphonse Blouin III) testified that he alone had started the July 10, 1976 fire on Belle Island. Defendant contends that in light of this evidence no rational juror could avoid having a reasonable doubt as to defendant's guilt of arson and, hence, the evidence was insufficient to prove defendant guilty of arson.

We disagree. Even though defendant and his son testified that defendant's son had accompanied defendant, Libby and Gilpatrick to Belle Island, no other witnesses saw defendant's son at the lake on the day of the fire. Moreover, there were numerous internal inconsistencies in the testimony given by defendant's son. For example, defendant's son first suggested that Libby had started the fire. After a recess during the trial, however, he changed his story and claimed that it was he, the son, who started the fire. In view of the inconsistencies in the testimony as well as the overwhelming evidence of defendant's guilt

set forth at the beginning of this opinion, it was for the jury to say whether or not there was a reasonable doubt that defendant was guilty of arson. Assessing the credibility of witnesses and resolving conflicts in the testimony is exclusively the province of the jury. *State v. Boucher,* Me., 376 A.2d 478 (1977).

The entry is:

Appeals denied.

Judgments affirmed.

DELAHANTY, J., did not sit.

---

**4.** At the time of defendant's hearsay objection, the presiding Justice ruled that Libby's statement was not hearsay because it was made in the defendant's presence (and thus apparently was an adoptive admission). Later in the trial when defendant moved for a mistrial in relation to this same issue, the Court denied the motion, finding that the statement was not hearsay

because it was made by a co-conspirator of a party during the course of and in furtherance of a conspiracy. Rule 801(d)(2)(E). Because we have concluded that the Justice properly admitted the testimony as an adoptive admission, we need not decide whether the testimony would be admissible as that of a co-conspirator under Rule 801(d)(2)(E).