STATE OF MAINE

WALDO, ss.

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-99-90
DHM - WAL-8/2/00

STATE OF MAINE

v.

NATACHIA RAMSEY,

Defendant

ORDER ON MOTIONS
TO SUPPRESS

STATE OF MAINE
Waldo County Superior Court

AUG 0 2 2000

REC'D AND FILED
Joyce M. Page, Clerk

This matter is before the court on three motions brought by the defendant. On April 27, 1999, the defendant was indicted for intentionally and knowingly causing the death of Hunter Ramsey, defendant's child. On July 19, 1999, defendant filed a motion to suppress the results of a search of her home pursuant to a warrant, a motion to suppress statements made by the defendant to the investigating detective of the Maine State Police, and a motion to suppress statements made by the defendant to employees of the Searsport Ambulance Service. The motion to suppress the statements to the detective is founded upon alleged violations of *Miranda v. Arizona* and the motion to suppress statements to the Searsport Ambulance Service are based upon *State v. Caouette*. The challenge to the search of defendant's home alleges that the affidavit for the search warrant utilized statements made by the defendant that are privileged under M.R. Evid. 503.

The court held two evidentiary hearings on the motions as consolidated, taking testimony from the first deputy sheriff on the scene, the retired director of the Searsport Ambulance Service, an emergency medical technician (EMT) with the Searsport Rescue Service, a detective of the Maine State Police, a licensed clinical

social worker with Mid-Coast Mental Health, and a support information referral resource person from the Ingraham Crisis Center. From these witnesses and the evidence admitted, this court finds the following facts as to the events of April 11, 1999, the date of the alleged offense.

On that date, the defendant, a person with a history of severe emotional and psychological deprivation, found herself in a mobile home in rural Searsport with her youngest child, born March 11, 1999. Repeated attempts by the defendant to cause her estranged husband to come to the trailer and discuss marital matters with her had been unsuccessful. Sometime during the day, her husband came to the trailer to pick up their older child, a seven year-old daughter, but the husband left without conferring with the defendant. As a result, the defendant, in a sense of abandonment and continuing to suffer from depression which marked a major influence of her life, called the local medical facility to obtain the phone number of a crisis center. The purpose of the call to the crisis center is unclear. On the one hand, the defendant was intent on committing suicide. On the other hand, the defendant appeared to be reaching out for help to relieve her of her dire circumstances. The person taking the call at the crisis center, an individual of significant education and experience, described the telephone demeanor of the defendant as a person suffering from great guilt and depression seeking to end her life. At one point, the crisis worker surmised that the defendant had a baby in her presence and became concerned over the welfare of that baby. As the discussion progressed, the defendant's affect moved from great guilt and hysteria to reasonable and

2

comprehensible conversation but as the crisis worker attempted to make inquiry with respect to a baby, the defendant went into extreme crying, wailing, and was unresponsive. The crisis worker attempted to obtain the defendant's location, but she gave him a telephone number inconsistent with the caller I.D. display at the crisis center. As other employees of the center were attempting to alert authorities in the Searsport area, they became aware that the location given by the defendant was inconsistent with the information received from rescue personnel and a law enforcement officer.

On three occasions, the defendant left the phone and remained away, leaving the line connected. Ultimately, the crisis worker was successful in calming the defendant to the point that he was satisfied she was rationally explaining her situation, including the information that she had recently ingested 20 Tylenol P.M. pills. She confirmed the number with the crisis worker by stating that she had counted the pills and they were all she had in the house. The crisis worker described the defendant at this point in the conversation as "grounded," meaning that he detected she had regained control of her emotions and was talking things out. However, the authorities were ultimately successful in reaching the correct mobile home. Failing to receive a response by knocking at the door, the deputy sheriff knocked down the door and "cleared" the trailer. At the time of the deputy sheriff's entry, the defendant was on the phone with the crisis worker. Immediately upon her advising the worker that the authorities were at her door, she became emotionally overwrought and started crying, wailing, and otherwise displaying

3

severe emotion. At the same time, she dropped the phone but did not hang it up. The crisis center determined that the rescue workers had the correct location through a combination of telephone lines with the Sheriff's Department and the open line connection.

When the deputy sheriff entered the trailer, he immediately noticed blood in the kitchen and as he raced through the structure to "clear" the building, he noted the defendant in the bathroom. The EMT's went into the bathroom where they found the defendant sitting on the floor with her hands and lower arms in a bathtub full of warm water. The water was red from the blood coming from the wrists of the defendant. Defendant held a razor in one hand. She was crying uncontrollably and acting as if she wanted to be left alone. She would not relinquish the razor in spite of requests by the EMT's. She advised the EMT's that she wanted to die. Unsolicited, she advised the EMT's within the earshot of the deputy sheriff that her baby was in the bedroom. An EMT immediately went to the bedroom and discovered the dead child. After repeated pleadings, the EMT's were successful in recovering the razor from the hand of the defendant, draining the bathtub, bandaging her wrists, and walking her to the living area of the mobile home where she was placed on a ambulance stretcher and taken to the Searsport Ambulance Service vehicle.

In the bathroom in the mobile home and during the ride to the hospital in the ambulance, the defendant made repeated statements implicating her responsibility for the death of her child. The context was that she wanted to die, she

4

wished the medical personnel would leave her alone and let her die, that there was no hope for herself and her baby, and that she wanted to be with her baby in death.

At the hospital, the defendant's wrists were sutured and bandaged. While in the emergency room, a taped interview of the defendant was conducted by a State Police detective. After some preliminary questions, the detective read the *Miranda* warning to the defendant and solicited her acknowledgement and understanding. The defendant was highly unresponsive. While it is difficult to determine from listening to the audiotape, apparently, and the detective so testified, at this point the defendant acknowledged her understanding of her rights under the principles of *Miranda*. It is clear, however, that she advised the detective that she did not wish to talk. It is also clear, under the totality of the circumstances, that she wanted them to leave so that she could be left alone with her grief. Nevertheless, the detective advised the defendant that while she did not have to answer his questions, he was going to continue to ask questions and she could then advise him whether she would no longer answer any questions, or just some questions, and that she could advise him as to which questions she would be willing to answer. The detective characterized the interview in the emergency room as being an attempt to determine the welfare of the defendant's older child and to determine what could be done to assist her in her dilemma. However, interspersed with questions as to her family and the other child, were questions directly related to the death of the baby. In spite of being told that she did not want to answer his questions, the detective asked the defendant, "What happened today?" At a later time in the discussion he

5

asked, "Why did this happen?" As he continued his questions and comments in support of her terrible dilemma he asked, "What could have prevented this from happening?" At one point the officer said that a lot of this type of thing was happening in Maine today, that there had been enough tragedy today, and that he was trying to prevent further tragedy. At this point, the defendant went into a very deep and hard crying. As the detective attempted to place responsibility for the defendant's horrible situation, the defendant stated, "Chris wouldn't help." Shortly thereafter the detective asked, "What happened that made it happen?" Shortly thereafter he asked, "What about Hunter?" The defendant responded by saying that she, "wanted Hunter with me."

After this interview, the defendant was taken by medical personnel to the intensive care unit of the hospital. While there, the officers continuing their questioning of her, and sought to receive a consent to search her home. As they discussed the consent and advised defendant of her rights under such consent principles, she asked the detective, "Why do you want to search the trailer?" The officer's response was, "Why do you think we want to search?" Her response was, "It doesn't matter."

The following morning a crisis worker with Mid-Coast Mental Health, upon request, went to the Waldo County Hospital for purposes of completing a "blue paper" process evaluation. She met with the defendant and conducted an assessment finding the defendant was totally overwhelmed, not oriented, confused, and still suicidal. The worker determined the defendant could not answer her

6

questions competently and could not give coherent answers. She testified that the defendant knew that detectives were outside the room and at one point asked for the police to come in to her room to inquire, "When will the baby be back?" At that point, the "blue paper" was executed.

In support of the motion to suppress, the defendant presented the testimony of a knowledgeable and experienced Ph.D. forensic clinical psychologist. He conducted interviews with the defendant starting in April, 1999 and continuing through July, 1999, and also listened to the audiotapes of the interviews by the Maine State Police detectives in the emergency room and the intensive care unit. It is his professional opinion that, in the presence of the EMT's and the officer at the mobile home, the defendant was suffering from severe postpartum depression which continued some two weeks later at his interview. He found her profoundly depressed, giving disassociative answers, would drift off the subject, appeared to be having difficulty breathing, and was sweating profusely. The psychologist was satisfied that she wanted to die and at the time she called the crisis center she was preoccupied with a real or imagined loss to which she ruled out all but two alternative choices in her circumstance -- to do nothing in which any solution is not possible or to take one's own life. The psychologist opined that, because defendant had not been eating or sleeping before the event and had been taking medications and the numerous Tylenol, her nervous system was affected and the suicide ideation was a natural expectation to extinguish psychological suffering. Her cognitive abilities were affected, causing restriction of thought such that her only

7

perception of life was one of helplessness and hopelessness. These circumstances impaired her ability to make choices and she became preoccupied with death. She had an unrealistic perception of what was happening.[1] All of defendant's decisions were impacted by her condition and her impaired capacity to analyze the circumstances. The psychologist is satisfied that the defendant did not possess the ability for rational intellect.

The psychologist testified that this condition continued into the hospital where the audiotapes made it clear that the defendant was overcome by helplessness, hopelessness, and restriction of thought. It is the psychologist's opinion that at the time of the events in question, the defendant was suffering from a severe psychiatric affliction.

The psychologist was confronted with the report of the crisis worker at the Crisis Intervention Center which included observations that the defendant appeared to be coherent, lucid and responsive at certain points in the conversation other than when the child was mentioned. The psychologist continued to believe that defendant was psychotic at the time, operating under delusions, and with no adequate contact with reality. The psychologist holds this opinion notwithstanding that defendant did point out the location of the child to the EMT's, did describe the manner in which the child met its death, and who was responsible for that death. He opined that while she was suffering to some degree from a sense of remorse and

---

[1] Defendant's mother committed suicide when defendant was 14 years of age. Her mother's father committed suicide one year later.

guilt, her emotion was controlling her thought processes and she was suffering from a biological depression. Awareness of a death was a fleeting thought coming and going for the defendant.

When the court inquired as to the relationship of defendant's condition, as described in the opinion of the psychologist, to the concept of voluntariness, the witness said that in the sense of voluntary conduct, the defendant "just didn't care."

The State presented a child and adult forensic psychiatrist who had conducted the Stage II evaluation of the defendant. She had last interviewed the defendant in May, 2000. It was her professional opinion that the defendant was not psychotic at the time she was with the EMT's in the mobile home, that her reality was not impaired, and that her thoughts were coherent. While she clearly was depressed, the doctor indicated that the history revealed depression for many years and she disputed whether this depression was a "postpartum" depression which might involve hormonal conditions.[2]

The psychiatrist's report reveals that there was no evidence of psychotic thinking by the defendant during her stay in AMHI but that she did suffer from major depression. To the extent that the report indicates that the defendant was in somewhat of a vegetative state, the doctor testified that this would be a physical effect from sleeplessness and loss of appetite.

_____

[2] Various records reveal that the defendant attempted suicide on at least two occasions in her younger years.

9

The psychiatrist testified that this was a case of classic depression and agreed that it is characterized by a sense of hopelessness and helplessness where the individual sees no light at the end of the tunnel and that things will never get better.

The doctor believed that the defendant showed rational thinking at the time of the incident. She called the hospital to get the phone number for the crisis center. She called the crisis center and, at times, was very lucid in her phone conversation. She withheld information or gave incorrect information to the crisis center so that they would not interfere with her plan to carry out her suicide. She was goal directed in her suicide plan and she left suicide notes. The doctor was aware that the defendant wanted to be sure that the hospital told her daughter that she loved her and that she instructed others not to let her daughter into the trailer that afternoon. The witness testified that she concluded that the defendant believed that her act was rational and that the wrist cutting was not delusional but was part of her plan. She supports that conclusion by the evidence that the defendant cut her wrists a second time when the first did not bleed fast enough and placed her wrists in a bathtub filled with warm water to hasten the bleeding. The doctor also notes that there was not excessive blood loss in the event.

The witness agreed that major depression is an Axis I condition in DSM IV which is classified as a mental illness. However, her diagnosis was that defendant was depressed, exhausted, under the influence of the Benadryl in the Tylenol, was dopey and sleepy, and was suicidal. She opined that the pills, not the depression,

may have impaired defendant's cognitive abilities and that she did display vegetative signs of agitation, lack of sleep, and lack of appetite. The witness believed that the depression caused poor judgment and the defendant, weighing her options, believed that the death of her child and herself were rational conclusions. The psychiatrist also concluded that the defendant did not want to answer the questions of the detective at the hospital, that she was very confused by the detective's questions, and that all she wanted was for the detective to leave her alone. The conclusion by the State's psychiatrist was that the statements made by the defendant to the EMT's were driven by an overwhelming sense of guilt and remorse, and that they were the product of an emotional outburst.

The defendant argues that these facts are similar to those found in *State v. Caouette*, 446 A.2d 1120 (Me. 1982) and *State v. Rees*, 2000 ME 55, 748 A.2d 976. She believes her statements were not voluntary, were a violation of her privileges, and were not the result of her free will and rational intellect. She believes that she was not able to make free choices at the mobile home but was driven by emotion which overcame her cognitive abilities. At the hospital, she argues that the continued questioning was a violation of the principles of *Miranda*, that she did not want to talk to the officers, but, consistent with her distress at the time, she had a sense of helplessness to get rid of the officers.

In response, the State argues that the principle of *Caouette* is that voluntariness is fact-specific for the trial justice. It has cited a long list of cases in which voluntariness was found notwithstanding impaired condition of the

11

defendant and that the facts in this case simply show an emotional arousal that is insufficient to destroy a sense of voluntary conduct. The State argues that under the circumstances, defendant showed rational behavior notwithstanding her irrational idea of suicide. The State believes that her capacity to withhold information is evidence of such behavior. Further, the State argues that the defendant's statements arose out of a sense of guilt and remorse which were the major motivating forces for her to make the statements that she did.

The court first considered *State v. Collins*, 297 A.2d 620, 626 (Me. 1972), in which the Law Court stated:

> The constitutional privilege against self-incrimination, as a limitation upon government, provides its own inherent evidentiary exclusionary doctrine predicated upon 'voluntariness.' It reflects a high priority commitment to the principle that excluded as available to government is any person's testimonial self-condemnation of crime unless such person has acted 'voluntarily,' i.e., unless he has 'waived' his constitutional privilege against self-incrimination by choosing, freely and knowingly, to provide criminal self-condemnation by utterances from his own lips.

The Court further held that under such circumstances, the prosecution must establish the legal admissibility of a confession by "proof beyond a reasonable doubt." *Id*. at 627. In 1982, the Law Court decided *State v. Caouette*, 446 A.2d 1120 (Me. 1982), holding that in the absence of police compulsion or elicitation, a statement may nevertheless be held to be involuntary where circumstances of incarceration and physical and emotional condition of defendant preclude a finding that his statement resulted from the exercise of free will and rational intellect. *Id*. at 1121. This test of voluntariness, as cited in *Caouette, id*. at 1123, comes from

12

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961) where the U.S. Supreme Court described the test of voluntariness:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of a confession offends due process. *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 734. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature and however infused, propels or helps to propel the confession.

Therefore, the statements must be made while the defendant is free from "compulsion of whatever nature" and is the result of defendant's exercise of her own free will and rational intellect.

This court then examined the recent case of *State v. Rees*, 2000 ME 55, 748 A.2d 976, in which the Law Court reaffirmed its decision in *Caouette*. In *Rees*, the Court affirmed an order of suppression which was based on the trial court's conclusion that the defendant suffered from dementia and therefore it could not conclude, beyond a reasonable doubt, that the defendant's statements to law enforcement officers were the product of the free exercise of his will and rational intellect. The court goes on to say "[w]hile proof that a defendant's statement is spontaneous and unsolicited will often result in a finding of voluntariness, such proof does not compel a finding that the defendant was free from 'compulsion of whatever nature.'" *Id.* ¶ 3, 748 A.2d at 977-78 (quoting *Caouette*, 446 A.2d at 1123-24). As to this meaning of "compulsion," this court notes the quote from the dissent in *Lego v. Twomey*, 404 U.S. 477, 491 (1972) which described safeguarding ". . . the right

13

of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances."

This court then considered a line of cases cited by the State in which voluntariness was found notwithstanding the impairment of the defendants for guidance in this determination. In *State v. Finson*, 447 A.2d 788 (Me. 1982), the Court held that "[a] person under the influence of alcohol is not necessarily incapable of waiving his constitutional rights or giving a voluntary statement, if despite the degree of intoxication he is aware and capable of comprehending and communicating with coherence and rationality." In that case, the officer testified that the defendant "gave meaningful responses to the questions asked of him." *Id.* In *State v. Clark*, 475 A.2d 418, 421-22 (Me. 1984), the confession of the defendant was not suppressed in spite of the fact that the defendant appeared "tired, like he had been up a while and had a rough night," was "spaced out," and "had been drinking." In *State v. Hewes*, 589 A.2d 460 (Me. 1991), the Court found that although the defendant was crying and upset at the time the *Miranda* warning was given, his emotional distress did not render the waiver of his *Miranda* rights invalid. *Id.* at 461 (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)). The Court also relied on *Caouette* and *Collins*, reaffirming the standard of proof on voluntariness and holding that "[n]either defendant's emotional distress at the time he made those statements nor the detective's urging him to tell the truth negates the voluntariness of his statements." *Id.* In *State v. Smith*, 615 A.2d 1162, 1163 (Me. 1992), the Court discussed the requirement of the trial court to determine whether a statement is

14

voluntary by considering the totality of the circumstances. In that case, the statement of the defendant was found to be voluntary in spite of his low I.Q. and emotional distress. *Id.* at 1163-64. Finally, this court examined *State v. Cumming*, 634 A.2d 953 (Me. 1993). In that case, the statements by the defendant were found to be voluntary notwithstanding the mental distress of the defendant and the expert testimony challenging the voluntariness. *Id.* at 955-56.

Has the State proven beyond a reasonable doubt, in each stage of the circumstances, that defendant's statements were voluntary, the result of her free exercise of will and rational intellect, and not subject to compulsion from whatever source?

Let's start with some definitions. Webster's II New Riverside University Dictionary (1988) defines "voluntary" as arising from one's own free will, controlled by individual volition, capable of exercising will, and proceeding from impulse. It defines "will" as the mental faculty by which one deliberately chooses or decides on a course of action, a deliberate intention or wish. "Deliberate" is defined as thought out or planned, careful thought, or intentionally. "Rational" is defined as ability to reason, logical sound mind. And, since there is evidence of a shorthand description that the defendant just didn't "care," the dictionary defines "care" as concerned or interested, to object or mind. Finally, one examines the dictionary for "compulsion," meaning the act of compelling or state of being compelled. In psychology, it is defined as an irresistible impulse to act irrationally. Completing the definition, the dictionary defines "compel" as to force, drive, or constrain.

15

Since voluntariness in this context requires a determination of the legal definition rather than a medical or psychological definition, the court examines *Black's Law Dictionary* (7th ed. 1999). "Voluntary" is defined as done by design or intention, unconstrained by interference, not impelled by outside influence. "Will" is defined as wish, design or choice. "Intent" is defined as the state of mind accompanying an act. "Intention" is defined as a willingness to bring about something planned. Further, "compulsion" is defined as the act of compelling, the state of being compelled or an uncontrollable inclination to do something. Finally, Black's Law Dictionary defines "compel" as to cause or bring about force or overwhelming pressure.

Both the State and the defendant agree that in her depression the defendant was in a state of mind of helplessness and hopelessness. It is agreed that she was suffering from severe depression. Defendant believes that her demeanor; the dopey effect of the Tylenol pills; the symptoms of her nervous system, displaying lack of appetite, lack of ability to sleep, the restriction of her cognitive abilities; and her preoccupation with suicide made it clear that she was not exercising rational intellect. Defendant believes she was mentally ill and that her intention, clearly expressed to take her life, was so compelling in light of all the circumstances that she did not possess free will and a rational intellect. The State, on the other hand, points to her attempts to get assistance through the crisis center and the manipulation in her conversation to prevent intervention by medical personnel and law enforcement authorities such that she had developed a very rational plan

to destroy herself and that destroying the child was part of the plan. The State would argue that while that may not be rational from a moral, social or public policy point of view, it was part of the logic, intention, and reasoning undertaken by the defendant in a rational sense. Indeed, the State points to a number of instances when the defendant was coherent, calm, "grounded," and otherwise clearly able to communicate in a rational manner. It was only when reference was made to her baby that she displayed symptoms of irrationality. The State points out that there was nothing to compel the defendant to advise the EMT's of the presence of a child and his location. The State would point out that the overwhelming emotion affecting defendant's mental processes was one of guilt and remorse. She made an unsolicited statement to the crisis center worker that she had done a terrible thing and needed to die. She explained the details of her consuming the Tylenol, including counting the pills. She advised the crisis center worker that she wanted to tell him what the bad thing was that she had done but she could not and at one point advised the worker that she felt silly and embarrassed in calling him.

The court must find the testimony of a psychiatrist more credible than that of a psychologist in medical matters wherein the State denies that defendant was psychotic in the mobile home, that she did not have impaired thoughts of reality, and that her thoughts were not coherent. The testimony was that she was depressed, not psychotic, and that the depression had been existent for a long time. The State makes it clear that the evidence showed that the defendant was not

17

delusional, that she had a plan in the manner in which she was attempting suicide, and was thought out all based upon her ability to reason.

There is no evidence the defendant was suffering from delusions. The psychiatric evidence is that she was not psychotic. From the time she called the crisis center until she was released from AMHI or thereabouts, she was intent on committing suicide. She resisted, in a reasoned way, efforts by the crisis center worker and the EMT's to prevent the suicide. There is no evidence of any external force other than the circumstances of her life and personal existence at the time in question to suggest her lack of exercise of free will. Her intellect was rational in the sense that she had a plan, an intention, and reasoning under the circumstances. Whatever caused her to take action with respect to her child and to attempt to destroy herself, and whatever limitations she may have been under in sensing the choices available to her, there is no evidence that the statements themselves were made under a compulsion and therefore, free from a compelling force from whatever source.

Therefore, this court concludes that, under the standards of the State of Maine, the State has proven beyond a reasonable doubt that the statements made by the defendant to the EMT's and the ambulance attendants in the presence of a deputy sheriff were voluntary and the defendant was not deprived of the free exercise of will or rational intellect. Further, while the court reaches no conclusion as to whether the evidence suggests that there was compulsion in the defendant to commit suicide, the court believes the State has met its burden in establishing that

18

there was no compulsion in defendant to make the statements that she made. Further, the court is satisfied that whether disturbed over her failure to successfully complete the suicide or the death of her child, the emotion overtaking, to some degree, the reasoning of the defendant was premised on guilt or remorse and therefore, not compelled by the suicidal ideation.

Because the affidavit for the search warrant was based, to some extent, upon statements made by the defendant to the EMT's, the search is not invalid based upon probable cause founded upon inadmissible statements. To the extent the defendant's statements to the EMT's and the ambulance attendants were made during the course of medical treatment and suicide prevention by the medical personnel, the statements were not made as part of diagnosis and treatment by medical attendants and therefore, are not subject to the doctor/patient privilege.

The statements made by the defendant to the detective and the two interviews in the emergency room and intensive care unit of the hospital are another matter. This court is not aware of any doctrine which suggests that a person seeking to exercise their rights under *Miranda* and terminate an interview with a law enforcement authority should be subjected to circumstances wherein they have to exercise those rights for each individual question. Secondly, the consent to the questioning after *Miranda* was devoid of any affirmative expression by the defendant. It was simply the "impression" of the officer that the defendant wished to continue to answer questions or to make a selective choice as to the questions to be answered. Finally, while much of the interview was couched in terms of

19

attempting to assist the defendant, to protect her other child, and to create family support, it was clearly interspersed with questions directly related to culpability for the death of the child, causing the entire questioning to be in the nature of interrogation and investigation of the murder and clearly unacceptable under the circumstances.

The entry will be:

Defendant's motion to suppress the results of the search filed July 20, 1999, is DENIED; defendant's motion to suppress statements filed July 20, 1999, is GRANTED; defendant's second motion to suppress statements filed April 4, 2000, is DENIED.

Dated: August  /  , 2000

Donald H. Marden
Justice, Superior Court

20

STATE OF MAINE
   vs
NATACHIA RAMSEY
MOUNT EPHRAIM RD.
SEARSPORT ME 04974

DOB: 02/05/1974
Attorney: JOHN PELLETIER
          APPOINTED 05/26/1999

Filing Document: INDICTMENT
Filing Date: 04/27/1999

SUPERIOR COURT
WALDO, ss.
Docket No BELSC-CR-1999-00090

## DOCKET RECORD

State's Attorney: FERNAND LAROCHELLE

Major Case Type: MISDEMEANOR (CLASS D,E)

## Charge(s)

1  MURDER                                    04/11/1999 SEARSPORT            LANG              / MSP
   17-A   201(1)(A)           Class M

## Docket Events:

04/27/1999 FILING DOCUMENT - INDICTMENT FILED ON 04/27/1999

DONALD L. GARBRECHT
LAW LIBRARY

AUG 7 2000

04/28/1999 TRANSFER - BAIL AND PLEADING REQUESTED ON 04/27/1999

          DA:  LEANE ZAINEA
          ON BEHALF OF FERNAND LAROCHELLE, DIVISION CHIEF, DEPT. OF ATTY. GEN.
04/28/1999 TRANSFER - BAIL AND PLEADING GRANTED ON 04/27/1999
          RAE ANN  FRENCH , JUDGE
          DISTRICT COURT JUDGE SITTING IN SUPERIOR COURT FOR GRAND JURY RISE.  CERTIFIED COPY OF
          ORDER TO CLERK OF DISTRICT COURT.
04/28/1999 Charge(s):  1
          WARRANT - ON COMP/INDICTMENT REQUESTED ON 04/27/1999
          RAE ANN  FRENCH , JUDGE

          DA:  LEANE ZAINEA
          JUDGE FRENCH RECUSES.  JUSTICE MILLS TO ACT ON REQUEST. AG OFFICE REQUESTS WARRANT BE HELD
          UNTIL DEFT. RELEASED FROM AUGUSTA MENTAL HEALTH INSTITUTE.
05/26/1999 MOTION - MOTION TO TRANSFER FILED BY DEFENDANT ON 05/26/1999

          DEFT. REQUESTS THAT THIS MATTER BE TRANSFERRED TO KENNEBEC COUNTY SUPERIOR COURT FOR
          ARRAIGNMENT.
05/26/1999 MOTION - MOTION TO TRANSFER GRANTED ON 05/26/1999
          DONALD H MARDEN , JUSTICE
          CASE TRANSFERRED TO KENNEBEC COUNTY FOR ARRAIGNMENT.  NOTICE OF ENTRY AND COPY ORDER TO
          ATTYS. LAROCHELLE AND PELLETIER.  ORIGINAL FILE FORWARDED TO KENNEBEC COUNTY BY FIRST
          CLASS MAIL.
06/08/1999 MOTION - MOTION FOR APPOINTMENT OF CNSL FILED BY DEFENDANT ON 06/02/1999

06/08/1999 MOTION - MOTION FOR APPOINTMENT OF CNSL GRANTED ON 06/02/1999
          JOHN R ATWOOD , JUSTICE
          JOHN D. PELLETIER, ESQ. IS APPOINTED TO REPRESENT DEFENDANT.
06/08/1999 MOTION - MOTION FOR MENTAL EXAMINATION FILED BY STATE ON 06/02/1999

06/08/1999 MOTION - MOTION FOR MENTAL EXAMINATION GRANTED ON 06/02/1999
          JOHN R ATWOOD , JUSTICE

Printed on: 08/02/2000